907 A.2d 321

MARYLAND BOARD OF PHYSICIANS

v.

Robert Michael ELLIOTT.

No. 1137, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Sept. 13, 2006.

372

374

Sarah Earlene Pendley (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellant.

William A. Beale, Towson, for appellee.

Panel MURPHY, C.J., HOLLANDER and CHARLES E. MOYLAN, Jr. (retired, specially assigned), JJ.

MOYLAN, J.

This administrative appeal raises several intriguing questions about the intricate matrix of relationships between an administrative agency and the Office of Administrative Hearings (OAH) to which the agency sometimes delegates some or all of its adjudicatory functions. Does the authority to delegate expand or contract when the adjudication is primarily 1) demeanor-based fact-finding, 2) other fact-finding that is not so dependent on demeanor assessment, or 3) the application of the law to essentially undisputed facts? Does the deference, if any, that the agency owes to the conclusions of the Administrative Law Judge (ALJ) expand or contract with the nature of the thing that the ALJ adjudicated? On judicial review, does the circuit court and then the appellate court look only to what the agency ultimately did or also to what the ALJ may have done? Need we be concerned about whether the ALJ used the right or wrong burden of persuasion? It is a fascinating matrix that deserves periodic reexamination.

On September 30, 2003, the appellant, the Maryland Board of Physicians ("the Board"), denied the Application for Reinstatement of Medical License submitted by the appellee, Dr. Robert M. Elliott. Dr. Elliott appealed that denial to the Circuit Court for Baltimore County, which, on June 29, 2005, reversed the decision of the Board. The Board has, in turn, appealed to us.

## Personal Background

Dr. Elliott is a physician who practices dermatology and specializes in hair restoration. He was originally licensed to practice medicine in the State of Maryland on October 23, 1991, but his Maryland license registration expired on September 30, 1992. Dr. Elliott is currently a partner, with Robert True, M.D., in a medical practice known as the Elliott–True Medical Group, with offices in California, Illinois, Maryland, and New York. Dr. Elliott's primary practice is in California and he is a resident of that state.

## Procedural Background

In December of 1999, Dr. Elliott submitted an Application for Reinstatement of his Medical License to what was then designated as the Maryland Board of Physician Quality Assurance. Effective July 1, 2003 by Chapter 252 of the Maryland Laws of 2003, the Board's name was changed to the Maryland Board of Physicians. On September 13, 2000, the Board issued a Notice of Initial Denial of Dr. Elliott's Application.

Pursuant to Maryland Code, Health Occupations Article, § 14–205, the Board possesses the authority to deny a license for any actions which would, on the part of a licensee, constitute grounds for disciplinary action under § 14–404. Section 14–205 provides, in pertinent part:

(a)(1) In addition to the powers set forth elsewhere in this title, *the Board may:*

. . . .

(iii) Subject to the Administrative Procedure Act, *deny a license to an applicant or refuse to renew or reinstate an*

*applicant's license for any of the reasons that are grounds for action under § 14–404* of this title.

(Emphasis supplied).

The notice of denial was based on allegations that Dr. Elliott had committed acts that would, had he been a licensee, have violated § 14–404(a)(1), in that he fraudulently or deceptively attempted to obtain reinstatement of his medical license for himself; § 14–404(a)(3), in that he was guilty of unprofessional conduct in the practice of medicine; and § 14–404(a)(36), in that he willfully made misrepresentations when seeking or making application for reinstatement of his medical license.

The letter of "Initial Denial" also informed Dr. Elliott that he was entitled to a hearing before an Administrative Law Judge and to the opportunity, should the findings and recommendations of the ALJ be adverse to him, to "file exceptions and present argument to the Board."

*If you request a hearing in this matter,* please be advised that you must prove by a preponderance of the evidence that you are entitled to be reinstated by the Board. You should note that *an Administrative Law Judge will conduct the hearing in accordance with the Administrative Procedure Act,* Md.Code Ann., State Gov't § 10–201 *et seq. The Administrative Law Judge will submit proposed findings of fact* to the Board for the Board's consideration. *If the proposed findings are adverse to you, you will be given an opportunity to file exceptions and present argument to the Board before the Board reaches a final decision.*

(Emphasis supplied).

Dr. Elliott did, indeed, "request a hearing in this matter." Accordingly, the case was assigned by the Office of Administrative Hearings to Administrative Law Judge Joan B. Gordon. In *Maryland Board of Physicians v. Bernstein,* 167 Md.App. 714, 721, 894 A.2d 621 (2006), Judge Deborah Eyler explained the applicable principles and procedures governing such delegation.

At that point, *the physician is entitled to a contested case hearing before an administrative law judge* in the Office of Administrative Hearings, pursuant to the Administrative Procedure Act, section 10–201 *et seq.* of the State Government Article ("SG"). *Following the hearing, the ALJ issues findings of fact, conclusions of law, and a proposed disposition.*

*Either party may file exceptions* to the ALJ's findings and proposed disposition.

*The Board is not bound by the decision of the ALJ.* After receiving the ALJ's proposed decision, *the Board must* review the record and the ALJ's proposal, and *hold a hearing on any exceptions. It then issues a final decision* stating its findings of facts, conclusions of law, and a disposition of the charge.

(Emphasis supplied).

After a procedural glitch that is not pertinent to what is now before us, ALJ Gordon conducted a two-day hearing beginning on November 19, 2002. On March 17, 2003, she issued a Proposed Decision. The ALJ's proposed conclusions of law were that Dr. Elliott had violated the Maryland Medical Practice Act by acts that would qualify as violations of § 14–404(a)(1), (3), and (36). As a proposed disposition, the ALJ recommended that Dr. Elliott's application for reinstatement of medical license be denied.

Dr. Elliott filed timely Exceptions to the Proposed Decision of the ALJ. An Exceptions hearing was held before the Board on May 28, 2003. The Board issued its Final Order on September 30, 2003, in which it denied Dr. Elliott's application for the reinstatement of his medical license. Dr. Elliott appealed that decision of the Board to the Circuit Court for Baltimore County. Following a hearing on April 20, 2005, that court, on July 6, 2005, issued an Opinion and Order reversing the decision of the Board and remanding the case for further proceedings.

## The Contentions

The Board, in turn, has appealed to us. It contends

1. that there was substantial evidence to support the decision of the Board; and

2. that the "clear and convincing" burden of persuasion did not apply in this case, but that even if it, *arguendo*, did apply, it was satisfied.

## A False Light On the Shore

During the course of oral argument and our first preliminary consideration of the case, a troubling question arose, *sua sponte*, casting into at least momentary doubt the propriety of the Board's having submitted the case to the OAH. There were distant echoes about "demeanor-based credibility findings," but the connection, if any, of those faint resonances to what was before us was uncertain. Was it possible that, although the delegation of demeanor-based fact-finding to an ALJ might be appropriate, the delegation of authority to reach more technical findings and even tentative conclusions of law might not be appropriate? Although we were soon disabused of the doubt, it behooves us, at the threshold, to address that issue of what is a proper delegation of adjudicative authority by an administrative agency to an ALJ.

## The Propriety of Submitting the Case To the Office of Administrative Hearings

Procedurally, this case is governed squarely by the Administrative Procedure Act, Maryland Code, State Government Article, §§ 10–201 *et. seq.* As Judge James Eyler observed in *Bragunier Masonry Contractors v. Maryland Commissioner of Labor and Industry*, 111 Md.App. 698, 705, 684 A.2d 6 (1996), *cert. denied*, 344 Md. 566, 688 A.2d 445 (1997):

> The model administrative procedure act was developed to encourage a more uniform procedural process for administrative agencies. *Maryland adopted the 1961 version of the model with some changes. See* SG §§ 10–201 et seq. *The APA applies to all state administrative agencies not specif-*

*ically exempted* and provides a standard framework of fair and appropriate procedures for agencies that are responsible for both administration and adjudication of their respective statutes.

(Emphasis supplied). See also *Kaufman v. Taxicab Bureau, Baltimore City Police Department,* 236 Md. 476, 479–80, 204 A.2d 521 (1964) (*"[T]he Administrative Procedure Act shall apply to all State agencies except those expressly excluded therefrom."*) (emphasis supplied). A major premise is thus established.

■ The appellant, Maryland Board of Physicians, both under its present name and under its former name of Board of Physician Quality Assurance, clearly qualifies as an "Agency" within the definition of § 10–202(b). In terms of being covered by the Administrative Procedure Act, moreover, the Board of Physicians has never been "expressly excluded" or "specifically exempted" from its coverage. A minor premise is thus established.

The Board's coverage by the APA thereby becomes the ineluctably valid conclusion of a classic categorical syllogism:

All agencies that are not specifically exempted are covered by the APA.

The Board of Physicians is an agency that is not specifically exempted.

*Ergo,* the Board of Physicians is covered by the APA.

A quick look at the case names leads us to the same conclusion inductively: *Young v. Board of Physician Quality Assurance,* 111 Md.App. 721, 684 A.2d 17 (1996); *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 729 A.2d 376 (1999); *Solomon v. Board of Physician Quality Assurance,* 132 Md.App. 447, 752 A.2d 1217 (2000); *Gabaldoni v. Board of Physician Quality Assurance,* 141 Md.App. 259, 785 A.2d 771 (2001); *Oltman v. Maryland State Board of Physicians,* 162 Md.App. 457, 875 A.2d 200 (2005); *State Board of Physicians v. Bernstein,* 167 Md.App. 714, 894 A.2d 621 (2006). Q.E.D.

■ Under the APA, the decision of the Board to grant or to deny the renewal of Dr. Elliott's license to practice medicine in the State of Maryland was unquestionably a "contested case." Section 10–202(d), defining "contested case," provides in pertinent part:

(1) *"Contested case" means a proceeding before an agency to determine:*

. . . .

(ii) *the* grant, denial, *renewal,* revocation, suspension, or amendment *of a license that is required* by statute or constitution to be determined only after an opportunity for an agency hearing.

(Emphasis supplied). See *Modular Closet Systems, Inc. v. Comptroller,* 315 Md. 438, 443–48, 554 A.2d 1221 (1989); *Maryland Pharmacists Association v. Attorney General,* 115 Md.App. 650, 656–58, 694 A.2d 492 (1997).

Section 10–205, in turn, grants to an Agency the discretionary authority to delegate to the Office of Administrative Hearings the actual conducting of a hearing in such a contested case. Subsection (a) provides, in pertinent part:

(a) *To whom delegated.*—(1) *A board,* commission, or agency head authorized to conduct a contested case hearing *shall:*

(i) conduct the hearing; or

(ii) *delegate the authority to conduct the contested case hearing to:*

1. *the Office [of Administrative Hearings].*

(Emphasis supplied).

With respect to the OAH, to which adjudicating responsibility is delegated, in *Anderson v. Department of Public Safety,* 330 Md. 187, 623 A.2d 198 (1993), Judge Orth adverted to the establishment of the Office of Administrative Hearings in 1989 and then explained the salutary effect of making available to a complainant "an impartial hearing officer" rather than a hearing officer "under the control of the agency" with the possibly resultant appearance of "unfairness or bias."

> *One of the main objectives* of the Legislature in establishing the OAH *was to provide an impartial hearing officer in contested cases. A hearing officer employed by* and under the control of *the agency* where the contested case or other disputed action arises, *often results in the appearance of an inherent unfairness or bias* against the aggrieved.

330 Md. at 213–14, 623 A.2d 198 (emphasis supplied). This salutary effect, emanating in no small measure from the appearance of neutrality, would self-evidently inure from an ALJ's conclusions of law as readily as from an ALJ's findings of fact.

Once a contested case has been delegated by an Agency to the OAH and then assigned to an ALJ for a hearing, the controlling procedural regimen is that which has been well described by Judge Harrell in *Kohli v. LOOC, Inc.,* 103 Md.App. 694, 712, 654 A.2d 922 (1995), *reversed in part on other grounds, LOOC, Inc. v. Kohli,* 347 Md. 258, 701 A.2d 92 (1997).

> Under Maryland's current system of State administrative procedures, set forth in The Administrative Procedure Act ("the APA"), Md.Code Ann., State Gov't § 10–101 et seq. (1993 Vol. & Supp.1994), *the head of a covered agency has the option,* under § 10–205 of the APA, *of* either allowing the agency itself to conduct the hearing in a contested case, or *delegating such authority to the Office of Administrative Hearings ("the OAH"), which designates an administrative law judge to perform that function. In the event that an agency elects to have the OAH play a role in the hearing process, administrative law judges are generally employed not to render a final decision* as a result of the hearing, *but rather to develop a record and to make a recommendation to the agency head, which may either be adopted, modified, or rejected at the agency's discretion.*

(Emphasis supplied).

When the agency "delegates the hearing responsibility to the ALJ," moreover, the ALJ then "becomes an extension of [the agency]." *Bragunier,* 111 Md.App. at 707, 684 A.2d 6. A

perhaps unwieldy board of commissioners enjoys the benefit of having a trained examiner.

## Avoiding Confusion Between Degrees of Deference hand the Discretion to Delegate

But is there a limitation on the types of adjudicatory responsibility that may be delegated? Does what we shall call the *Anderson–Shrieves* Deference Rule possibly stretch this far? When an agency, pursuant to § 10–205(b), delegates to an ALJ the limited task of making only *proposed* findings of fact and/or *proposed* conclusions of law, the agency is ordinarily at liberty, in making its own independent final decision, to override the ALJ. A recent sunburst of caselaw, however, has imposed a narrow limitation on one aspect of an agency's otherwise unfettered entitlement to override the conclusions of the ALJ. Because of the prominence of this recent flurry of activity, we were, during the course of oral argument, momentarily tempted to chase an illusory analogy down what would have been a rabbit hole.

The temptation was to confuse 1) that very limited area of demeanor-based fact-finding with respect to which the ALJ enjoys an unusually high degree of deference with 2) a limitation on the type of adjudicating that may be delegated to the ALJ in the first instance. A close look at the recent caselaw, fortunately, occasioned a quick correction of course. It may nonetheless be helpful to pin down the illusive chimera lest others be lured by it down the same false trail.

## The *Anderson–Shrieves* Distinction

A new distinction in the caselaw first surfaced in *Anderson v. Department of Public Safety*, 330 Md. 187, 623 A.2d 198 (1993). An administrative agency (the Department of Corrections) totally overrode the fact-finding of an ALJ and reached its own contrary findings of fact. The issue before the Court of Appeals was, quite properly, whether the agency had a substantial basis for its own ultimate fact-finding. If there were enough independent evidence to constitute a rational basis for the agency's own fact-finding, its decision would be

sustained, under the substantial evidence test, notwithstanding the ALJ's findings to the contrary.

Because of the superior opportunity for the ALJ to observe witnesses and to make demeanor-based credibility assessments, however, the failure of the agency to defer to the ALJ in a case in which demeanor and credibility were significant factors could not be totally ignored. Such a disdain for the ALJ, unexplained, might have an erosive effect on the "substantial basis" the agency would need to rely on to support its decision on appellate review. There was a psychic tension between two conflicting principles, and the Court of Appeals looked for guidance to the federal Administrative Procedure Act and especially to the opinion of the Supreme Court in *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Even while preserving the substantial evidence test as the ultimate criterion, the Supreme Court nonetheless observed:

> We intend only to recognize that *evidence* supporting a conclusion *may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the [agency's] than when he has reached the same conclusion.*

340 U.S. at 496, 71 S.Ct. 456 (quoted at 330 Md. at 216, 623 A.2d 198) (emphasis supplied).

The Court of Appeals, in turn, recognized the unique value of first-hand observation of a witness's demeanor.

> *All aspects of the witnesses demeanor*—including the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication—*may convince the observing [hearing officer] that the witness is testifying truthfully or falsely.*

330 Md. at 216, 623 A.2d 198 (quoting *Penasquitos Village, Inc. v. N.L.R.B.*, 565 F.2d 1074, 1078–79 (9th Cir.1977)) (emphasis supplied).

The Court of Appeals finally quoted with approval, 330 Md. at 217, 623 A.2d 198, from 1 Charles H. Koch, Jr., *Administrative Law and Practice* (1985), § 6.73, p. 520:

> *[T]he credibility findings of the person who sees and hears the witnesses*—be he ALJ, juror or judge—*is entitled to considerable deference.* While the degree of deference due the ALJ's final decision is related to the importance of credibility in a particular case, *the ALJ's decision to give or deny credit to a particular witness' testimony should not be reversed absent an adequate explanation of the grounds for the reviewing body's source of disagreement with the ALJ. In sum, the review authority has the power to reject credibility assessments only if it gives strong reasons for doing so.*

(Emphasis supplied). The Court of Appeals reversed the agency.

A year later, Judge Motz picked up on the theme and further refined it in *Department of Health and Mental Hygiene v. Shrieves,* 100 Md.App. 283, 641 A.2d 899 (1994). In that case, the final decision of the administrative agency was diametrically contrary to the proposed decision by the ALJ. At the outset of analysis, Judge Motz pointed out that it is, of course, the final decision of the agency, and not the antecedent decision of the ALJ, that is both reviewed by the courts and entitled to deference by the courts. The standard for reviewing the decision of the agency remains the "substantial evidence" standard. Nothing in *Anderson* changed that. It was nonetheless appropriate to fine-tune our mode of assessing what is substantial evidence.

> Only if that order [of the agency] is not based on substantial evidence can it be reversed by a court.... *[T]he " 'substantial evidence' standard is not modified in any way when the [agency] and its examiner disagree."*

> The court below erred in viewing its "job" as "determin[ing] if the ALJ had a rational basis for making the decision she did" or if the ALJ's decision was supported by substantial evidence. *The court's "job" was not to assess*

*the "rationality" of or evidentiary basis for the ALJ's recommendation; it was to assess the rationality or evidentiary basis of the agency's ... final order.* Drexel Burnham Lambert, Inc. v. Commodity Futures Trading Comm'n, 850 F.2d 742, 747 (D.C.Cir.1988) (when the agency and an "ALJ disagree on factual inferences to be drawn from the record ... *the question to be decided is not whether the agency has 'erred' in 'overruling' the ALJ's findings, but whether its own findings are reasonably supported on the entire record ").*

100 Md.App. at 297, 641 A.2d 899 (emphasis supplied).

### Limitation No. 1: The Substantial Evidence Test Trumps Everything Else

The *Shrieves* opinion made clear that there are two basic limitations on what might otherwise be read, overbroadly, into the *Anderson* opinion. Because the substantial evidence test remains the ultimate and absolutely controlling consideration on judicial review, it does not matter that the agency may have ignored the findings and the proposed decision of the ALJ, even without having had any rational basis for doing so, just so long as there still exists some other basis for the agency's decision that would be enough, in and of itself, to satisfy the substantial evidence test.

*[T]he question is not "whether the agency erred" in overruling the ALJ but whether there is substantial evidence for the agency's decision.* Accordingly, the "power of administrative law judges to render initial decisions does not mean that [an agency] is 'relegated to the role of [a] reviewing court.' "

*... It is the agency's responsibility to make the final decision; in doing so, it certainly may "substitute" its judgment for that of the ALJ.* Moreover, *the agency's substituted judgment must be affirmed* by a court—*if it is based on substantial evidence.* The ALJ's recommendation—and particularly its credibility findings—are part of that evidence, but *if there is "evidence to support each of two conflicting views," e.g., the ALJ's and the agency's, the*

*findings of the agency "must be allowed to stand despite the fact that [a court] might have reached the opposite conclusion* on [its] own."

100 Md.App. at 302, 641 A.2d 899 (emphasis supplied).

 Judge Motz encapsulated our holding in a nutshell.

To summarize, *when an administrative agency overrules the recommendation of an ALJ, a reviewing court's task is to determine if the agency's final order is based on substantial evidence* in the record. In making this judgment, the ALJ's findings are, of course, part of the record and are to be considered along with the other portions of the record.... *If* after giving appropriate deference to the ALJ's demeanor-based findings *there is sufficient evidence in the record to support both the decision of the ALJ and that of the agency, the agency's final order is to be affirmed—even if a court might have reached the opposite conclusion.* This approach preserves the rightful roles of the ALJ, the agency, and the reviewing court: it gives special deference to both the ALJ's demeanor-based credibility determinations and to the agency's authority in making other factual findings and properly limits the role of the reviewing court.

100 Md.App. at 302–03, 641 A.2d 899 (emphasis supplied).

## Limitation No. 2: Testimonial Inferences Versus Derivative Inferences

 Even in those cases in which there is no independent evidence on which to base an agency decision that is contrary to the proposed decision of the ALJ, moreover, there is yet a further limitation on the possible reading of *Anderson* that the agency must justify its departure when it departs from the fact-findings of the ALJ. The *Shrieves* opinion pointed out that not all fact-finding by an ALJ is entitled to special deference by the delegating agency, but only those findings of fact which are demeanor-based credibility determinations.

Generally, *the ALJ's findings,* however, *"are not entitled to any special deference from the agency except insofar as [they] are based on witness credibility determinations."*

*The significance* to be given to ALJ's credibility determinations *"depends largely on the importance of credibility in the particular case." If credibility is not important in the agency's final decision, an ALJ's credibility determinations are not very significant. If credibility is of "utmost importance,"* if it "played a dominant role," if it was "pivotal" to an agency's final order—as in *Anderson—then an ALJ's credibility determinations are entitled to substantial deference.*

100 Md.App. at 298–99, 641 A.2d 899 (emphasis supplied).

It was the *Shrieves* opinion, quoting *Penasquitos Village, Inc. v. N.L.R.B.*, 565 F.2d 1074, 1078–79 (9th Cir.1977), that introduced into the Maryland juridical lexicon the critical distinction between "(1) testimonial inferences, 'credibility determinations based on demeanor;' and (2) derivative inferences, 'inferences drawn from the evidence itself.'" Demeanor-based credibility determinations are, by their nature, deserving of deference.

*All aspects of the witness's demeanor*—including the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other nonverbal communication—*may convince the observing trial judge that the witness is testifying truthfully or falsely. These same very important factors, however, are entirely unavailable to a reader of the transcript.*

100 Md.App. at 300, 641 A.2d 899 (quoting *Penasquitos Village, Inc.*, 565 F.2d at 1078) (emphasis supplied).

The Agency, on the other hand, owes no such deference to the derivative inferences of the ALJ, notwithstanding the fact that they fall within the generic category of fact-finding.

But it should be noted that *the administrative law judge's opportunity to observe the witnesses' demeanor does not,* by itself, *require deference with regard to his or her derivative inferences.* Observation makes weighty only the observer's testimonial inferences.

Deference is accorded [an agency's] factual conclusions for a different reason—[the agency is] presumed to have broad experience and expertise in [the area].... Further, it is the [agency] to which [the legislature] has delegated administration of the [statute]. *The [agency], therefore, is viewed as particularly capable of drawing inferences from the facts.... Accordingly, ... a [reviewing court] must abide by the [agency's] derivative inferences,* if drawn from not discredited testimony, unless those inferences are "irrational," ... "tenuous" or "unwarranted."

*Id.* quoting *Penasquitos Village, Inc.,* 565 F.2d at 1078–79 (emphasis supplied).

Derivative inferences, frequently derived from undisputed evidence, may readily be based on an agency's professional expertise and familiarity with procedures uniquely within its ken. With respect to such derivative inferences, therefore, the agency owes no deference to the ALJ. *Shrieves* concluded that the limitations on the deference rule that it articulated were implicit, even if not explicit, in the *Anderson* opinion.

Although *Anderson* did not explicitly adopt the view that only an ALJ's demeanor-based credibility determinations are entitled to special deference, it *does appear to have implicitly adopted this position.*

*Id.* (emphasis supplied).

### The *Anderson–Shrieves* Deference Rule In Practice

In the twelve years since the *Shrieves* decision, the *Anderson–Shrieves* Deference Rule has been addressed by this Court on four occasions and by the Court of Appeals on one occasion. In *Gabaldoni v. Board of Physician Quality Assurance,* 141 Md.App. 259, 785 A.2d 771 (2001), Judge Salmon noted, 141 Md.App. at 261, 785 A.2d 771, that "an interesting question arises when an agency decides an issue after an Administrative Law Judge makes factual determinations with which the agency later disagrees." After reviewing the *Shrieves* opinion, we held that the Board's "different factual conclusions" were based on the Board's own derivative

inferences. *Id.* at 263, 785 A.2d 771. On essentially undisputed facts, the critical derivative inference (indeed, the Board's ultimate decision) was whether the appellant doctor had breached the standard of care. We affirmed the decision of the Board to go its own way as one based on substantial evidence, to wit, on derivative inferences unaffected by the *Anderson–Shrieves* Deference Rule. See also *Berkshire Life Insurance Co. v. Maryland Insurance Administration*, 142 Md.App. 628, 647–48, 791 A.2d 942 (2002).

In *State Commission on Human Relations v. Kaydon Ring & Seal, Inc.*, 149 Md.App. 666, 818 A.2d 259 (2003), the administrative agency (the Commission on Human Relations) ultimately found that an employer had wrongfully fired an employee because of his race. The ALJ who conducted the evidentiary hearing in the case, by contrast, had earlier found that such was not the case.

Judge Deborah Eyler wrote for this Court as we held that the agency had no basis for rejecting the contrary demeanor-based findings of the ALJ.

> Both Skinner and Henry testified, and the ALJ found, that when Skinner fired Henry, he did so in anger and remarked that Henry could not "cut it," *i.e.*, could not perform.... [T]he Appeal Board adopted the ALJ's finding that Henry's performance, as measured by production and efficiency ratings, was deficient. *It was the Appeal Board's finding of disparate treatment, contrary to the ALJ's finding,* and on a contested issue, *that was crucial to its ultimate finding* that despite Skinner's "can't cut it" remark, he in fact fired Henry because Henry is black.
>
> *The evidence of disparate treatment in this case was conflicting and only could be resolved by a demeanor-based credibility assessment of certain witnesses.*

*Id.* at 703–04, 818 A.2d 259 (emphasis supplied).

The resolution of the critical issue in the case depended on which of two contradictory bits of testimony was to be believed. As such, the issue should have been submitted to the ALJ, and the decision of the ALJ in that regard should have been extended due deference by the agency.

Depending upon which of these witnesses is believed, and what parts of their testimony are credited, *a fact finder reasonably could conclude that Skinner treated Henry and Morgan differently* by telling Henry or leading him to think he could not apply for other jobs at Kaydon while leading Morgan to think he could, and then not standing in his way—*or reasonably could conclude that Skinner did not do so. Precisely what Skinner said or did, and did not say and do, in this regard is not something that can be determined without a credibility judgment about the witnesses that only can come from observation.*

*Id.* at 704, 818 A.2d 259 (emphasis supplied).

The *Kaydon* opinion also added an efficacious tool to our analytic kit, as it coined a distinction between a "cold record" and a "live record."

In assessing the rationality and evidentiary basis for the agency's final decision, however, *we may take into account* as a factor *that on a cold record the agency made a decision contrary to the one the ALJ made on a live record, i.e.,* upon first-hand observation of witnesses.

*Id.* at 693, 818 A.2d 259 (emphasis supplied).

An instructive contrast emerges from juxtaposing our decision in *Kaydon* with the opposite result in *State Board of Physicians v. Bernstein,* 167 Md.App. 714, 894 A.2d 621 (2006). In *Kaydon* we had held that demeanor-based findings of fact should have been made by the ALJ and should have been extended deference by the agency, whereas in *Bernstein* we held that derivative inferences drawn by the ALJ could be overridden by the agency with no deference needing to be shown.

The critical issue was whether Dr. Bernstein, an anesthesiologist, was subject to disciplinary action by the State Board of Physicians for having breached the requisite standard of care. A contested case hearing was held over the course of three days by an ALJ. "The focus of the hearing was expert testimony about the appropriate standard of care." 167 Md. App. at 728, 894 A.2d 621. The ALJ found the testimony of

Dr. Bernstein's experts to be more credible than that of the Board's experts. Indeed, the ALJ found one of the Board's experts to have been biased. "The ALJ concluded that none of the charges brought by the Board established a breach of the standard of care." *Id.* at 744, 894 A.2d 621. Exceptions were taken to the ALJ's findings and proposed disposition. After a hearing, the Board found facts contrary to the findings made by the ALJ and ultimately ruled that Dr. Bernstein had, indeed, breached the standard of care.

After thoroughly analyzing the entire *Anderson–Shrieves* body of caselaw, *id.* at 751–55, 894 A.2d 621, Judge Eyler's opinion labeled the issue being adjudicated as "a classic battle of the experts." *Id.* at 757, 894 A.2d 621. Her opinion pointed out that the ALJ had, indeed, found Dr. Bernstein's experts to be more "credible" than the Board's experts, but that that particular credibility assessment had been based on something other than demeanor.

> Here, *the ALJ stated several times* in her proposed decision *that the appellee's expert witnesses were credible, and that they were more credible than the Board's expert witnesses. The reasons she gave* to support her credibility findings *did not involve assessments of the witnesses based on their demeanor,* however. Clearly, *the ALJ found the appellee's experts to be more experienced, more proficient, more knowledgeable, and more objective than the Board's witnesses, and determined on those bases that their opinions were sound and correct,* and were "persuasive" and "credible." *She said nothing to indicate that the outward appearances of the expert witnesses as they testified played a part in her credibility evaluations* of their testimony. By her own account of her evaluation of the evidence, *the ALJ did not place any importance upon the demeanor of the expert witnesses in deciding which of them was more credible in their testimony.*

*Id.* at 759–60, 894 A.2d 621 (emphasis supplied).

The opinion pointed out that expert testimony generally is not as dependent on demeanor-based credibility assessments as is the testimony of fact witnesses.

*[E]xpert witnesses usually are not testifying about first-level facts that are susceptible of a "true or false" determination* by the fact-finder (for example, whether the appellee indeed was in the operating room during extubation, as opposed to whether prevailing standards required him to be there). *Demeanor most often is a factor in deciding the credibility of a fact witness* who is testifying about a fact that may be true or false, *not of an expert who is offering his opinion based on assumed facts.*

*Id.* at 760, 894 A.2d 621 (emphasis supplied).

Even witness bias on the part of an expert is not essentially a demeanor-based determination.

*Bias can be shown on a cold record,* however; *a witness does not have to be observed for the fact-finder to determine that he has an interest in the outcome of the case* that has led him, consciously or not, to shade his testimony. In this case, *the appellee's counsel effectively cross-examined Dr. Lyles about his activities in support of legislation* that would have mandated that anesthesiologists personally perform certain tasks of patient care. . . . *The ALJ was impressed by this evidence, and it is part of the reason she gave little weight to Dr. Lyles's opinions. The Board had the prerogative to re-weigh evidence that was not demeanor-based,* however, and *it was not impressed with the bias evidence against Dr. Lyles, and weighed his opinions heavily.* . . . [T]he Board may make its own decisions about bias, interest, credentials of expert witnesses, the logic and persuasiveness of their testimony, and the weight to be given their opinions.

Accordingly, *the Board did not owe deference to the credibility assessments made by the ALJ, and was not required to state strong reasons for rejecting those assessments.*

*Id.* at 761, 894 A.2d 621 (emphasis supplied).

In concluding that the Board in that case was not inhibited from overriding the ALJ's findings, the opinion did contribute another analytically efficacious insight as it distinguished be-

tween 1) credibility assessments generally and 2) *demeanor-based* credibility assessments specifically. The *Anderson–Shrieves* Deference Rule applies only to the latter.

In *Consumer Protection Division v. Morgan,* 387 Md. 125, 874 A.2d 919 (2005), the Court of Appeals addressed, slightly obliquely, the distinction between demeanor-based credibility findings and other factual findings that may be inferred from documents and events. One of the many issues facing the Court was the contention that the agency (the Consumer Protection Division) had ignored the proposed findings of fact and the proposed decision of the ALJ and ruled that the defendants were, indeed, guilty of violating the Consumer Protection Act. Albeit phrased as a question of whether the agency could "make the requisite findings based only on a paper record," *id.* at 196, 874 A.2d 919, the issue was nonetheless, in the language of *Shrieves,* whether the conclusions of the agency were based on derivative inferences, which properly could have been made from a review of the transcript before the ALJ, or depended on testimonial inferences, in which case the agency shall either have given deference to the findings of the ALJ or should, on a rehearing, have observed testimonial demeanor for itself.

Judge Raker's opinion, 387 Md. at 197, 874 A.2d 919, explained that sometimes the required findings of fact are based on demeanor-based credibility.

> *This issue revolves around whether the Division's determination* of misrepresentations in comparable sales and neighborhood predominant values *was a demeanor-based credibility assessment.* A fact finder makes a demeanor-based credibility assessment when he or she bases a finding or decision on such factors as " 'the expression of [the witness or party's] countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication.' "

(Emphasis supplied).

The Court of Appeals further elaborated:

State courts similarly have held that an agency official may decide a case without hearing the witnesses testify.

*An exception exists when the agency decision depends necessarily upon a demeanor-based assessment.* In such cases, *it would be difficult for an agency designee to make findings without hearing the testimony.* Thus, in *Anderson,* we held that evidence supporting the agency's decision " 'may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different' " than the agency's conclusions. We stated that *an agency should give "appropriate deference" to the ALJ's demeanor-based findings, because the ALJ is in the unique position to make such judgments.*

387 Md. at 200–01, 874 A.2d 919 (emphasis supplied).

At other times on other issues, by contrast, the required findings may properly be made simply by relying on a written record.

*In some circumstances, the Division may make findings* and issue an order *in reliance on the written record,* without the Division Chief personally observing the witnesses as they testify.

Case law addressing the federal Administrative Procedure Act supports the conclusion that *an agency official may make findings and issue an order based on the written record alone.*

*Id.* at 197–98, 874 A.2d 919 (emphasis supplied).

Reliance on the written record was deemed to be sufficient in the *Morgan* case itself. Demeanor-based credibility assessments would have been of no more than minimal value and, therefore, were not required.

A conclusion based on this evidence necessarily would focus on appraisal standards, the accuracy of Morgan and Almony's appraisals, and the information available to the appraisers at the time of the appraisal. As such, *the determination would focus on the experts' testimony, Hinton's reports, Ramsay's reports, Morgan's testimony about*

*his understanding of appraisal procedures, and, most importantly, Morgan and Almony's actual appraisal reports.*

*An assessment of the appraisers' demeanor is of minimal importance in this technical case.* Ordinarily, *demeanor has been held to be of little consequences in evaluating the credibility of experts* who provide conflicting testimony. *Id.* at 202, 874 A.2d 919 (emphasis supplied).

## The *Anderson–Shrieves* Deference Rule Only Applies When the ALJ and the Agency Disagree

The *Anderson–Shrieves* Deference Rule is of limited utility. It is a small wrinkle on the substantial evidence test. It does not apply to an ALJ's proposed decisions or conclusions of law. It does not apply to an ALJ's proposed findings of fact that are based on derivative inferences. It does not apply even to the assessment of credibility, when the credibility assessment is not primarily demeanor-based but is based on, as is frequently the case with expert witnesses, technical knowledge or specialized practices that implicate the expertise of the reviewing agency. It does not apply even to demeanor-based credibility findings if the reviewing agency has other substantial evidence supporting its decision to disregard the proposed findings of the ALJ. In the limited circumstances in which it does apply, it still does not necessarily bind the agency. It simply imposes upon the agency the additional burden of articulating a sound reason for not accepting the demeanor-based fact-finding of the ALJ.

The overarching limitation is that the entire *Anderson–Shrieves* body of caselaw, by definition, only applies when the proposed findings of the ALJ and the desired findings of the agency are in disagreement with each other. Each of the seven cases that comprise this body of law was a case in which the ALJ proposed to go in one direction and the administrative agency went in a different direction. Only in the face of such disagreement do questions even arise as to whether the agency has a substantial basis to support its going off on its own.

Self-evidently, the *Anderson–Shrieves* Deference Rule could have no bearing on the case before us. In its Final Order of September 30, 2003, the Board, after reviewing the hearing conducted by the ALJ, expressly adopted the ALJ's findings as its own.

*The Board adopts all of the Administrative Law Judge's Findings of Fact numbers 1–31 as set forth in the Administrative Law Judge's March 17, 2003, Proposed Decision. The Board also adopts the Administrative Law Judge's additional factual findings set forth in the Discussion section of the Proposed Decision.*[2]

---

2. *The "Discussion" section of the ALJ's proposed decision (pp. 9–26) contains an evaluation of the evidence, further proposed factual findings and proposed conclusions of law. The Board adopts the ALJ's evaluation of the evidence therein, including the ALJ's credibility findings, as well as the ALJ's further proposed factual findings.*

(Emphasis supplied).

On every finding of fact, the ALJ and the Board were in full and total harmony.

**The *Anderson–Shrieves* Deference Rule Does Not Inhibit The Agency's Discretion to Delegate Adjudication**

The chimera that we have been laboriously trying to pin down involves something else. The *Anderson–Shrieves* body of caselaw has, indeed, taken one small subcategory of ALJ fact-finding—demeanor-based credibility assessments—and placed it on a pedestal. Based on the hierarchal distinction between the ALJ's findings of demeanor-based credibility and the ALJ's findings of everything else, the possibility that briefly beguiled us was that this favored subcategory of ALJ fact-finding might enjoy not simply preferred status upon review by the delegating agency but might, indeed, be the only category of fact-finding that may be delegated to the ALJ in the first instance. Our confusion was no more than fleeting. Its unsettling appearance, however, convinces us that we should blaze the trail for others with unmistakable certainty. The favored status of demeanor-based fact-finding has nothing to do with what may be delegated.

With respect to the delegation of authority to "conduct a contested case hearing" from an administrative agency to the Office of Administrative Hearings, State Government Article, § 10–205 makes it clear that the grant of adjudicatory authority is plenary. Subsection 10–205(b) provides, in pertinent part:

> (b) *Scope of authority delegated.—An agency may delegate to the Office [of Administrative Hearings] the authority to issue:*
>
> (1) *proposed* or final *findings of fact;*
>
> (2) *proposed* or final *conclusions of law;* [or]
>
> (3) *proposed* or *final findings of fact and conclusions of law.*

(Emphasis supplied). See *Bragunier Masonry Contractors v. Maryland Commissioner of Labor and Industry,* 111 Md.App. at 706, 684 A.2d 6:

> Under *SG § 10–205(a), a state agency may delegate all or some of its reviewing responsibility to an ALJ. The section is broad enough to allow the agency to determine the extent of the adjudicative responsibility given. See § 10–205(b).* This allows the various agencies enough flexibility to carry out their diverse functions in a logical manner.

(Emphasis supplied).

What is conferred on the OAH, and ultimately on the ALJ, is not only the authority to engage in every conceivable variety of fact-finding, but even to make proposed conclusions of law. Subsection (d) goes on to provide, in pertinent part:

> (d) *Delegation final; exception.*—(1) Except as provided in paragraph (2) of this subsection, *an agency's delegation and transmittal of all or part of a contested case to the Office is final.*

(Emphasis supplied).

■ The exercise of discretion to delegate or not to delegate and of what to delegate will not constitute an abuse of discretion under the arbitrary or capricious standard by which courts review the actions of administrative agencies. As

Judge Raker explained for the Court of Appeals in *Spencer v. Maryland State Board of Pharmacy*, 380 Md. 515, 531–32, 846 A.2d 341 (2004):

> Applying the legal principles outlined above, we hold that (1) *the determination by an agency to refer a case to the OAH is a matter committed to its discretion* and that (2) *the Board did not abuse that discretion under the arbitrary or capricious standard.*
>
> First, it is clear that *the Board's refusal to refer the case to the OAH was not a legal conclusion or a factual finding but rather a function of the Board's discretion.* The discretion is granted to the Board in § 10–205(b) which declares an "agency *may* delegate to the Office [of Administrative Hearings] the authority" (emphasis added) to hear the case. *The word "may" connotes a permissive, discretionary function of the agency when it delegates a case to the OAH.*

(Emphasis supplied).

The scope of what adjudicating authority may be delegated has never been confined. In *Anderson v. Department of Public Safety*, 330 Md. at 204, 623 A.2d 198, the ALJ went so far as to draft a proposed disposition of the case. In *Department v. Shrieves*, 100 Md.App. at 285–86, 641 A.2d 899, the ALJ, after making 85 findings of fact, concluded with a proposed decision in the case. In *Gabaldoni*, 141 Md.App. at 270, 785 A.2d 771, the ALJ concluded that Dr. Gabaldoni had violated the Medical Practice Act but that a sanction need not be imposed. In *Berkshire*, 142 Md.App. at 638–39, 791 A.2d 942, the ALJ proposed the final disposition of the case. In *Kaydon*, 149 Md.App. at 673–78, 818 A.2d 259, the ALJ applied the law to his factual findings and proposed a dismissal of all charges. In *Bernstein*, 167 Md.App. at 741–45, 894 A.2d 621, the ALJ, and not the Board of Physicians, made a finding of fact with respect to the standard of medical care. In *Consumer Protection Division v. Morgan*, 387 Md. at 155–56, 874 A.2d 919, the ALJ issued a proposed order disposing of the case.

In not one of these cases was there the faintest suggestion that, once the administrative agency delegated the adjudication to the OAH, the ALJ was not authorized to adjudicate, in plenary fashion, everything that the agency itself would have been empowered to adjudicate. Nor was there any suggestion that the administrative agency had abused its discretion in the initial delegation of adjudicatory authority itself.

■ On this threshold issue, we hold that for the Board to have delegated to the OAH the task of conducting a hearing was a proper action pursuant to the Administrative Procedure Act. The ALJ might then issue back to the Board both proposed findings of fact and proposed conclusions of law.

### How Far Do We Look Back?

There have been four stages of decision-making in this case: 1) the Proposed Decision of the ALJ; 2) the Final Order of the Board; 3) the Opinion and Order of the Circuit Court for Baltimore County; and 4) the present appeal to this Court. Perched as we are at Stage 4, on what should our review focus in looking back? In no uncertain terms, our appellate review is of what happened at Stage 2, the final action of the Board, and, except for coincidental glances, of nothing else.

### On Administrative Review We Look Through the Circuit Court, Not At It

■ Although this appeal, of course, is literally from the decision of the Circuit Court for Baltimore County, it is actually the antecedent decision of the Board of Physicians that we shall review. In *Pollard's Towing, Inc. v. Berman's Body Frame & Mechanical, Inc.,* 137 Md.App. 277, 287, 768 A.2d 131 (2001), we observed:

At the outset, *let it be clear whose decision is being reviewed and by whom.* The review on the ultimate merits is now being conducted by this Court. *We are not reviewing the procedural correctness of the earlier review by the circuit court. We are undertaking our own de novo review of the decision of the administrative agency. . . .*

The decision of the circuit court, therefore, is before us only in a *pro forma* capacity, as the necessary procedural conduit by which the decision of the administrative agency gets to us for our review.

(Emphasis supplied).

As we explained in *People's Counsel v. Country Ridge,* 144 Md.App. 580, 591, 799 A.2d 425 (2002), we are looking not *at* the circuit court decision but *through* it.

Although the judicial act being appealed to us is literally the June 13, 2001 ruling of the Baltimore County Circuit Court, our review will look not so much *at* the circuit court action as *through it* to the December 13, 2000 decision of the Baltimore County Board of Appeals.

(Emphasis in original).

In *Department of Health and Mental Hygiene v. Shrieves,* 100 Md.App. at 303–04, 641 A.2d 899, Judge Motz wrote to the same effect.

Moreover, it is well recognized in Maryland that, *when reviewing administrative decisions, the role of an appellate court is precisely the same as that of the circuit court. See, e.g., Baltimore Lutheran High Sch. Ass'n, Inc. v. Employment Security Admin.,* 302 Md. 649, 662, 490 A.2d 701 (1985) ("A reviewing court, be it a circuit court or an appellate court, shall apply the substantial evidence test").

(Emphasis supplied). See also *Tochterman v. Baltimore County,* 163 Md.App. 385, 404–05, 880 A.2d 1118 (2005). And see *Consumer Protection v. Morgan,* 387 Md. at 160, 874 A.2d 919 ("When this Court reviews the decision of an administrative agency, we employ the same standards as would the circuit court, and the inquiry is not whether the circuit court erred, but rather whether the administrative agency erred."); *Spencer v. State Board of Pharmacy,* 380 Md. 515, 523–24, 846 A.2d 341 (2004); *Board of Physicians v. Bernstein,* 167 Md. App. at 750, 894 A.2d 621; *McKay v. Department of Public Safety,* 150 Md.App. 182, 193, 819 A.2d 1088 (2003); *Anne Arundel County v. Muir,* 149 Md.App. 617, 625, 817 A.2d 938

(2003); *Stover v. Prince George's County*, 132 Md.App. 373, 380–81, 752 A.2d 686 (2000).

## We Review the Agency's Decision, Not the ALJ's Decision

At the other end of the time continuum, once our review has traveled back as far as the final decision of the Board, our time machine comes to a grinding halt. Except for its possibly peripheral influences on the final agency decision, the hearing before the ALJ does not concern us. An appellant who wants to obsess about all of the procedural missteps that allegedly were made by an ALJ may as profitably talk to the wall—unless, of course, those mistakes were then perpetuated in the final decision of the agency.

It was Judge Motz in the *Shrieves* opinion, 100 Md.App. at 297, 641 A.2d 899, who articulated how finely calibrated our focus of review is on the administrative agency itself.

> The court below erred in viewing its "job" as "determin[ing] if the ALJ had a rational basis for making the decision she did" or if the ALJ's decision was supported by substantial evidence. *The court's "job" was not to assess the "rationality" of or evidentiary basis for the ALJ's recommendation; it was to assess the rationality or evidentiary basis of the agency's ... final order. Drexel Burnham Lambert, Inc. v. Commodity Futures Trading Comm'n*, 850 F.2d 742, 747 (D.C.Cir.1988) (when the agency and an "ALJ disagree on factual inferences to be drawn from the record ... *the question to be decided is not whether the agency has 'erred' in 'overruling' the ALJ's findings, but whether its own findings are reasonably supported on the entire record* ").

(Emphasis supplied).

## The Board's Ruling

The Board's first contention is that its decision to deny Dr. Elliott's application for a reinstatement of his medical license was supported by substantial evidence and was, therefore, unassailable upon judicial review. We fully agree.

Under Health Occupations Article, § 14–205(a)(iii), the "Board may ... refuse to ... reinstate an applicant's license for any of the reasons that are grounds for action under § 14–404." The ALJ's proposed conclusions of law were that Dr. Elliott was guilty of actions which would have constituted violations by a licensed physician of § 14–404(a)(1), (3), and (36). Those subsections, in pertinent part, treat as subject to discipline any licensee, who

(1) Fraudulently or deceptively ... attempts to obtain a license ...;

(3) Is guilty of ... unprofessional conduct in the practice of medicine; or

(36) Willfully makes a false representation when seeking or making application for licensure.

Dr. Elliott filed Exceptions to the ALJ's Proposed Decision and a hearing before the Board was held. In its Final Order of September 30, 2003, the Board held that Dr. Elliott had committed actions that would, for a licensed physician, have been violations of § 14–404(a)(1). It made no findings with respect to § 14–404(a)(3) and (36). The Board "tend[ed] to agree" with the ALJ that subsections (a)(3) and (36) had been violated but concluded that it was unnecessary to reach those issues.

*Although the Board tends to agree with the ALJ that Dr. Elliott's conduct is also "unprofessional conduct in the practice of medicine" as that term is used in Section 14–404(a)(3), the Board need not reach this issue in order to decide this case and thus declines to do so. Likewise, though the Board agrees with the ALJ's discussion of the "good moral character" issue under § 14–307(b), and although the ALJ's comments indicate strongly that the ALJ meant to find a lack of good moral character, the ALJ made no conclusion of law on this issue, and the Board declines to add this issue at this point, in the circumstances of this case. Similarly, the Board declines to rule on whether the issue of whether false representations were made within the meaning of § 14–404(a)(36).* The Board notes that an

affirmative conclusion on any or all of these issues would not change the sanction imposed in this particular case.

(Emphasis supplied).

The following predicate evidence is undisputed. In December of 1999, Dr. Elliott submitted to the Board his Application for Reinstatement of Medical Licensure. The Board's reinstatement application form asked the following questions:

*Since your last registration:*

B) Has a state licensing or disciplinary board, or a comparable body in the armed services taken an action against your license, including but not limited to limitations of practice, required education, admonishment, reprimand, suspension, or revocation for an act that would be grounds for disciplinary action under Health Occupations Article § 14–404, Annotated Code of Maryland?

C) Has an investigation or charge been brought against you by a licensing or disciplinary body or comparable body in the armed forces?

. . . .

L) Have you been named as a defendant in a filing or settlement of a medical malpractice action within the past 5 years?

The application form further directed:

For each question answered YES, attach detailed explanation and documentation, including health claims, complaints, disciplinary actions, records and file numbers, current status and disposition.

Dr. Elliott answered "No" to all three questions. He did not attach any explanation or documentation with respect to any of those three questions. The issue now before us is whether there was substantial evidence to support the conclusion of the Board that one or more of those answers was deceptively false.

## Substantial Evidence Test

 In *Spencer v. Board of Pharmacy*, 380 Md. at 528–30, 846 A.2d 341, Judge Raker analyzed State Government Article, § 10–222(h), dealing with judicial review of the final decision of administrative agencies in contested cases. Depending on which aspect of an agency's decision is being reviewed, any of three different standards may come into play.

*When an agency makes "conclusions of law" in a contested case, the court,* on judicial review, decides the correctness of the agency's conclusions and *may substitute the court's judgment for that of the agency's.* This established principle of administrative law is exemplified in § 10–222(h)(3)(i)–(iv), which permits judicial modification or reversal of agency action that (i) is unconstitutional; (ii) exceeds the agency's jurisdiction; (iii) results from unlawful procedure; or (iv) is affected by "any other" error of law.

*In contrast, when an agency is not interpreting law but instead makes a "finding of fact," we have applied "substantial evidence" review.* Substantial evidence review of agency factual findings is embodied in § 10–222(h)(3)(v). That provision grants a court authority to overrule an agency's factual finding only when the finding is "unsupported by competent, material, and substantial evidence in light of the entire record as submitted." *According to this more deferential standard of review, judicial review of agency factual findings is limited to ascertaining whether a reasoning mind could have reached the same factual conclusions reached by the agency on the record before it.*

*Finally, there are circumstances when an agency acts neither as a finder of fact nor as an interpreter of law but rather in a "discretionary" capacity.* Logically, the courts owe a higher level of deference to functions specifically committed to the agency's discretion than they do to an agency's legal conclusions or factual findings. Therefore, *the discretionary functions of the agency must be reviewed under a standard more deferential than either the de novo review afforded an agency's legal conclusions or the substantial evidence review afforded an agency's factual find-*

*ings.* In this regard, the standard set forth in § 10–222(h)(3)(vi), *review of "arbitrary or capricious" agency actions, provides guidance for the courts as they seek to apply the correct standard of review to discretionary functions of the agency.*

(Emphasis supplied). See also *Maryland Transportation Authority v. King,* 369 Md. 274, 290–91, 799 A.2d 1246 (2002);[1] *Mehrling v. Nationwide Insurance Co.,* 371 Md. 40, 52–54, 806 A.2d 662 (2002).

■■■■■■ It is the substantial evidence test for administrative agency fact-finding that concerns us in this case. In *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 68, 729 A.2d 376 (1999), the Court of Appeals zeroed in on the substantial evidence standard:

> *[A] reviewing court decides "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached."* A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are

---

1. *MTA v. King,* a leading authority on judicial review of the decision of an administrative agency under the Administrative Procedure Act, points out, 369 Md. at 291, 799 A.2d 1246, a critical distinction between a mere abuse of discretion by an agency and an abuse of discretion "so extreme and egregious" that it may be deemed "arbitrary or capricious."

> The grounds set forth in § 10–222(h) for reversing or modifying an adjudicatory administrative decision do not include disproportionality or *abuse of discretion.* As long as an administrative sanction or decision does not exceed the agency's authority, is not unlawful, and is supported by competent, material and substantial evidence, *there can be no judicial reversal* or modification *of the decision based on* disproportionality or *abuse of discretion unless,* under the facts of a particular case, *the* disproportionality or *abuse of discretion was so extreme and egregious that the reviewing court can properly deem the decision to be "arbitrary or capricious."*

(Emphasis supplied). See also *Maryland Aviation Administration v. Noland,* 386 Md. 556, 577, 873 A.2d 1145 (2005); *Oltman v. Board of Physicians,* 162 Md.App. at 490–91, 875 A.2d 200.

Although every arbitrary or capricious act by an administrative agency may be, *ipso facto,* an abuse of discretion, every abuse of discretion is not, *ipso facto,* arbitrary or capricious within the contemplation of the APA and is not, in and of itself, good cause to reverse the agency's decision.

supported by the record. *A reviewing court must review the agency's decision in the light most favorable to it; ... the agency's decision is prima facie correct and presumed valid,* and ... it is the agency's province to resolve conflicting evidence and to draw inferences from that evidence.

(Emphasis supplied).

In *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 513, 390 A.2d 1119 (1978), Judge Eldridge emphasized the judicial deference that is due to the administrative agency.

In applying the substantial evidence test, we have emphasized that a "court should [not] substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken." *We also must review the agency's decision in the light most favorable to the agency, since "decisions of administrative agencies are prima facie correct"* and *"carry with them the presumption of validity."* [N]ot only is it the province of the agency to resolve conflicting evidence, but *where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences.*

(Emphasis supplied).

 *Consumer Protection Division v. Morgan,* 387 Md. at 160, 874 A.2d 919, stressed that the substantial evidence standard applies not only to an agency's findings of fact but also to an agency's findings on mixed questions of law and fact.

We apply "substantial evidence" review to agency findings of fact, overruling factual findings only when they are "unsupported by competent, material, and substantial evidence in light of the entire record as submitted." The standard for substantial evidence review is "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *We also apply the substantial evidence standard when reviewing mixed questions*

*of law and fact, issues of whether the agency applied the law correctly to the facts.*

(Emphasis supplied).

 In *Board of Physicians v. Bernstein,* 167 Md.App. at 751, 894 A.2d 621, this Court noted the "considerable weight" that judicial review should afford an agency's application of the statutory and regulatory provisions that are regularly administered by the agency.

When a reviewing court applies the substantial evidence test, it decides "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *"A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record."* The agency's decision must be reviewed in the light most favorable to it; because it is the agency's province to resolve conflicting evidence and draw inferences from that evidence, its decision carries a presumption of correctness and validity. *We give "considerable weight" to an agency's "interpretations and applications of statutory or regulatory provisions" that are administered by the agency.*

(Emphasis supplied).

### The Evidence Before the Board Was Bountiful

 In its Final Order of September 30, 2003, the Board pointed out that it had "consider[ed] the entire record in this case." It expressly adopted all 31 of the ALJ's findings of fact as set forth in the ALJ's Proposed Decision of March 17, 2003. Turning to the "Discussion" section of the ALJ's Proposed Decision, the Board also adopted the ALJ's additional "evaluation of the evidence therein, including the ALJ's credibility findings, as well as the ALJ's further proposed factual findings."

The evidence revealed that Dr. Elliott had had professional difficulties with respect to his practice of medicine in Illinois, Oregon, Massachusetts, and Maryland. It further revealed

that he had been sued for medical malpractice on three occasions.

## 1. Illinois

The express findings of the Board with respect to Dr. Elliott's difficulties in Illinois were as follows:

> In July 1992, *the Illinois Department of Professional Regulation* ("IDPR") *initiated an investigation of Dr. Elliott and filed a complaint against him* charging that Dr. Elliott employed and supervised persons who were not licensed to perform certain medical procedures in Illinois. On February 2, 1993, the IDPR filed *an Amended Complaint* against Dr. Elliott, and *added additional charges* against him. On August 16, 1993, *Dr. Elliott* entered into a Stipulation and Recommendation for Settlement with IDPR, in which he *admitted allowing unlicensed individuals to function in the role of surgical assistants* during the conduct of hair restoration surgeries. On November 12, 1993, *the IDPR* issued a follow-up Order dated November 12, 1993, which *required that Dr. Elliott undertake 20 hours of continuing education* dealing with topics of minor surgical procedures and the use of ancillary medical personnel. *That Order further required Dr. Elliott to cease and desist from permitting persons other than duly licensed personnel to perform certain medical procedures* under his supervision.

(Emphasis supplied).

On the basis of that Illinois Complaint, Amended Complaint, Stipulation and Recommendation for Settlement, and Follow-up Order, the Board concluded that Dr. Elliott "should have answered 'Yes' to Questions 8 B) and C) on his Reinstatement application" and should have "provided a detailed explanation of these Illinois medical board's disciplinary matters." [2]

---

2. One of the findings of the ALJ was that "practicing medicine with an unlicensed person or aiding an unauthorized person in the practice of medicine constitutes grounds for discipline in Maryland under [Health Occupation Title], § 14–404(a)(18)."

The Board went on to make a further finding as to Illinois and concluded that another inadequate answer had been furnished by Dr. Elliott.

*Three years later,* in June 1995, *the IDPR filed another Complaint against Dr. Elliott* alleging that he and a former partner engaged in illegal advertising by distributing brochures which included patient testimonials concerning hair transplants that violated the advertising provisions in the Illinois Medical Practice Act. *The IDPR eventually dismissed the advertising Complaint against Dr. Elliott on statute of limitation grounds. Even though the second IDPR Complaint was dismissed, Dr. Elliott should have answered "Yes" to Question 8 c) and explained the nature of the advertising Complaint and the outcome of the investigation* on the Reinstatement Application he submitted to the Board.

(Emphasis supplied).

## 2. Oregon

The Board made the following findings with respect to Dr. Elliott's practice in the State of Oregon.

On December 27, 1993, *the Oregon Board of Medical Examiners* (OBME) *issued a Voluntary Limitation of Practice Order limiting Dr. Elliott's medical practice in Oregon to hair restoration only.* This voluntary limitation of practice order contained Dr. Elliott's sworn statement acknowledging that the limitation would remain in effect until terminated by the OBME. *This limitation* on Dr. Elliott's practice *was the result of a recommendation made by the OBME after it reviewed the Illinois medical board's disciplinary matter against Dr. Elliott and Dr. Elliott's test scores on a Texas medical test.*

(Emphasis supplied).

The Board concluded that "Dr. Elliott should have answered 'Yes' to Question 8 B) and explained on his reinstatement application the nature of the limitation on his medical practice in Oregon."

### 3. Massachusetts

The Board also made a finding with respect to Massachusetts.

In January 1996, *the Massachusetts Board of Registration in Medicine* ("MBRM") *notified Dr. Elliott that it had opened a complaint against him* and a former partner and was investigating the propriety of certain advertising by Dr. Elliott's medical practice in Massachusetts. In March 1996, the MBRM notified Dr. Elliott that it dismissed the complaint against Dr. Elliott and his medical group.

(Emphasis supplied).

Notwithstanding the dismissal, the Board concluded that "Dr. Elliott should have answered 'Yes' to Question 8 C) on his Reinstatement Application and should have also explained the nature of the complaint and the outcome of the investigation."

### 4. Maryland

The Board also made a finding with respect to a complaint that had been filed against Dr. Elliott with the Maryland State Board of Physician Quality Assurance.

In June 1997, this Board, the Maryland State Board of Physician Quality Assurance, advised Dr. Elliott by letter that *the Board had received a complaint that Dr. Elliott allowed an unlicensed individual to practice medicine in Maryland.* That letter also advised Dr. Elliott that *the Board had opened an investigation into the complaint.* In July 1997, Dr. Elliott responded in writing to the Board about the complaint. After receiving Dr. Elliott's response to the complaint, this Board closed the complaint and the case against Dr. Elliott.

(Emphasis supplied).

The Board concluded that even though the complaint was ultimately dismissed, "Dr. Elliott should have answered 'Yes' to Question 8 C) ... and should have also described the nature of the complaint and the outcome of the Board's investigation of him on the reinstatement application."

## 5. Three Medical Malpractice Suits

Dr. Elliott had been sued for medical malpractice on three occasions within the five-year period covered by Question 8 L). The suits were in New York, Illinois, and California. All three suits were settled in favor of the plaintiffs. On all three occasions, Dr. Elliott's insurance carriers made payments on his behalf. The Board made the following finding.

Dr. Elliott submitted his reinstatement application to the Board on December 5, 1999. During the preceding five-year period from December 5, 1994, to December 5, 1999, *Dr. Elliott was named as a defendant in three ongoing malpractice lawsuits. All three lawsuits resulted in settlements in favor of the plaintiff patients.* Dr. Elliott's malpractice insurance carriers paid the plaintiff patients in the three malpractice actions $12,500 on July 24, 1998; $37,500 on February 1, 1995; and $15,000 on December 9, 1994. Thus, all three malpractice lawsuits were settled during the five-year time period preceding December 5, 1999, the date Dr. Elliott filed a reinstatement application with the Board.

The Board concluded that "Dr. Elliott should have answered 'Yes' to Question 8 L) and should have provided a detailed explanation and documentation ... about these three medical malpractice actions in which he was named as a defendant."

## An Act of Deliberate Deception

The documented records of complaints and investigations from the medical licensing boards in Illinois, Oregon, Massachusetts, and Maryland could not be disputed. Nor could the court records from New York, Illinois, and California about the malpractice suits that had been filed and settled.

The question before the Board was not what happened involving Dr. Elliott in Illinois, Oregon, Massachusetts, and Maryland, but his utter failure to make any mention of those happenings on his application for reinstatement. The never-ending lesson of Watergate is that it is seldom the original trespass that is fatal. It is the failure to come clean about the trespass. It is mind-boggling that an innocent applicant

would remain bovinely silent about all of those confrontations and difficulties with medical licensing authorities over the years in state after state and then, coyly, blame his silence on the inartful phrasing of the questions.

The only rational explanation lies in another direction, as described by the ultimate conclusion of the Board.

The Board agrees with the ALJ's factual findings that *Dr. Elliott knew he had been the subject of repeated complaints, investigations, board orders, and malpractice claims* and that *he deliberately intended to deceive the Board by his answers to the application questions.* As the ALJ forcefully noted, *Dr. Elliott's answers were false,* and *they were intended to induce the Board to act to its detriment by reinstating his license* without further investigation of his background, an action which would have been to the detriment of the Board and to the patients in this State. *Dr. Elliott's testimony* in which he gave various excuses for his actions *was not credible; his excuses are without merit.* (Emphasis supplied).

## Dr. Elliott's Testimonial Explanations

Dr. Elliott took the witness stand before the ALJ on November 19, 2002, and attempted to explain why he had answered as he did the questions previously discussed. As the ALJ summarized his testimony,

At the hearing, *the Respondent presented a wide array of excuses and/or reasons for not correctly answering the three questions on the application.* First, *the Respondent argued that the Application for Reinstatement is worded in a variety of misleading ways, that he misunderstood the questions* and did not believe that he needed to answer the three questions in the affirmative. Second, *he argued that the matters in Illinois, Oregon, Massachusetts and Maryland were either not disciplinary in nature or did not involve him directly.* Third, the Respondent argued that the records pertaining to the various states' investigations of his medical practice and the records regarding the mal-

practice lawsuits against him were kept by other persons and that he did not have ready access to accurate information. Fourth, *the Respondent insinuated at one point that he forgot about or never knew about the three malpractice lawsuits against him.* Fifth, he argued, in essence, that he believed he was "named" as a defendant in the malpractice actions only at the moment the lawsuits were filed. Sixth, *the Respondent argued that he should not have to report the Maryland complaint because the Board should be aware of its own investigations.* Seventh, *the Respondent argued that there has been no harm done* by his application answers because the Board's later investigation uncovered the truth.

(Emphasis supplied).

Dr. Elliott testified that he thought Question 8 C) referred only to an "investigation or charge" brought by a licensing or disciplinary body "in the armed forces." The critical phrase was "by a licensing or disciplinary body or comparable body in the armed services." In a vacuum, one might conceivably believe that the modifying phrase "in the armed services" qualified not only the "comparable body" following the disjunctive "or" but actually qualified, and thereby austerely limited, all licensing or disciplinary bodies. Dr. Elliott was, in effect, making the sophistical claim that the renewal application dealt only with one's licensing history in the armed services and with no licensing history since or elsewhere.

Question 8 C), however, was not in a vacuum. It was the third question in a tightly related package of twelve questions. In a slightly different word order, the first and second questions had already expressly established the distinction between "a state licensing or disciplinary board" and "a comparable body in the armed services." No sane and literate reader could doubt that the third question embraced the same entities. The totality of all 12 questions, moreover, made the omnibus nature of the inquiry unmistakably clear. The application unquestionably was seeking all available information about any licensing or disciplinary problems anywhere at anytime.

The ALJ's finding in this regard, adopted by the Board, rejected as "specious" and "disingenuous" this particular explanation based on not understanding the question.

*The Respondent testified that he found the questions* in the Application for Reinstatement to be *confusing and misleading.* However, *the Respondent is a sophisticated and well-educated professional* and *his claims that the application questions are misleading or confusing are disingenuous. The Application* for Reinstatement is a pre-printed form that is and *has been used routinely* by the Board *for the re-licensure of thousands of physicians. No credible evidence was produced* at the hearing to indicate *that physicians have had difficulty understanding the application. Clearly, the object of the application,* as with most applications, *is to obtain as much information as possible about an applicant.* The application provides space for an applicant to explain any answers. In addition, *Board staff members are available to answer any questions about the meaning of the questions.* The Respondent did not contact the Board for assistance prior to filing his application. *The Respondent* and his attorney *argued that Question 8 C* (Has an investigation or charge been brought against you by a licensing or disciplinary body or comparable body in the armed forces?) *was a limited inquiry about investigations or charges by a regulatory board connection solely to the armed forces. This is a specious argument.* The question means just what it says: "have you, the applicant, been the subject of an investigation or disciplinary charge by a licensing board, by a disciplinary board or by an armed forces body, that is comparable to a licensing or disciplinary board?" *Even assuming,* arguendo, *that a reasonable physician could have found the question misleading, there is no reason why the Respondent could not have made an inquiry and asked the Board or its lawyers how the question ought to be read and interpreted.* Moreover, *the disingenuousness of the Respondent's position* became most apparent when, on cross-examination, the respondent admitted that no body of the armed forces

licenses physicians. Therefore, *the Respondent's claims that he misinterpreted the questions and that that the questions are poorly written are entirely without merit.* (Emphasis supplied).

Question 8 B) could not be so adroitly deflected, and Dr. Elliott took the very different tack that his troubles with the licensing boards in Illinois, Oregon, Massachusetts, and Maryland were of a nature other than "disciplinary." The finding of the ALJ, adopted by the Board, rejected the very *bona fides* of that proffered explanation as "disingenuous." "Disingenuous" means "lacking candor." It means "deliberately playing dumb." It is a classic modality of deception. The finding was:

> *The Respondent* also *claims that none of the investigations* by Illinois, Oregon, Massachusetts or Maryland *pertained to disciplinary matters.* The Respondent also insinuated that because the Illinois complaints, the Massachusetts complaint, the Oregon complaint and Maryland complaint did not result in disciplinary action against him, he did not have to report any of those matters to the Board. *This argument ignores the thrust and unambiguous wording of Questions 8B and 8C. Question 8B* required the Respondent to report action taken against him, which *includes limitations of practice and required education.*

> Further, *the issue is* not whether each of the actions in Illinois, Oregon, Massachusetts and Maryland were disciplinary in nature, but *whether any state board* or body that regulates the practice of medicine *took any action against him. The application questions are not limited to an inquiry into disciplinary matters, and also ask, for example, about possible remedial obligations, such as required education. The disingenuousness of the claim aside,* a review of the evidence in this case reveals that *it is also patently false.*

> Board Exhibits 3b and 3c are *the Complaint and Amended Complaint filed by Illinois* against the Respondent in

1993. Page 2 and page 4 of the Complaint (Board Exhibit 3b) *state that the alleged acts or omissions charged against the respondent are "grounds for revocation or suspension of a Certificate of Registration."* Page 2 and page 3 of the Amended Complaint (Board Exhibit 3c) state that the alleged acts or omissions charged against the respondent are "grounds for revocation or suspension of a Certificate of Registration." *The Respondent was indeed investigated by a disciplinary body and was required to undergo education;* he should have answered "Yes" to Question 8B and 8C.

(Emphasis supplied).

If nothing else, Dr. Elliott's excuses for his silence were wide-ranging and versatile. In part, he blamed his office staff and his attorney.

Question 8L is unambiguous, yet the Respondent failed to answer it accurately. *The Respondent acknowledged that three malpractice actions had been filed against him and that he* (and apparently his partner) *filed answers to each malpractice claim.* In an attempt to explain his failure to provide a truthful and accurate answer to Question 8L, *the Respondent testified that he didn't personally have any records of the malpractice actions; his office kept some of the information; and his attorney had most of the information about the malpractice actions. Such disingenuous testimony ignores the fact that the Respondent had an obligation to provide truthful, accurate answers on his application regardless of who maintained his records.* Further, such claims ignore the fact that the correspondence from Illinois, Oregon, Maryland, and Massachusetts was sent to his personal attention, as were the initial filings of the three lawsuits.

(Emphasis supplied).

Dr. Elliott then shifted gears again and claimed that he had forgotten about the malpractice suits. It is difficult for us to imagine a physician who forgets being sued for malpractice. In any event, the ALJ's finding was:

*A fourth claim by the Respondent was that he forgot about or was unaware of the three malpractice lawsuits. I cannot accept as credible the Respondent's insinuations and claims that he forgot or did not know the malpractice claims* that were filed against him in the five brief years prior to his December 1999 application for reinstatement. His claims are especially lacking in credibility in light of the fact that *his insurance carriers paid out thousands of dollars in each of the three cases.* The fact that some or all of the records regarding those cases may have been in someone else's possession does not relieve the Respondent of his obligation to provide truthful answers to the questions posed in the Reinstatement Application.

(Emphasis supplied).

At another point in his testimony, however, Dr. Elliott remembered the malpractice suits but argued that although they had been settled within the five year period of limitations before he answered Question 8 L), the actual *filing* of the suits, to wit, the literal time at which he was first *named* as a defendant, had been back beyond the limitations barrier. He was parsing the language with a scalpel. The ALJ, and ultimately the Board, rejected that claim as "preposterous."

*The fifth claim by the Respondent is that he was "named"* in the three subject lawsuits *only at the time the actions were filed* in court—1988, 1991 and 1992 respectively. *This is a preposterous claim that ignores the fact that he continued to remain "named" as a defendant in those three lawsuits until they were settled*—in July 24, 1998; February 1, 1995; and December 9, 1994.

(Emphasis supplied).

Dr. Elliott offered the further excuse that he did not have to answer with respect to the Maryland claim against him because the Board itself should have known about it. That excuse was also rejected.

*The sixth allegation by the Respondent is he should not have to report the Maryland complaint because the Board should be aware of its own investigations.* This argument

ignores the fact that the Respondent is obligated to provide truthful, accurate and detailed information about *any* investigation or complaint and that the burden of providing accurate information is on him, not the Board.

(Emphasis supplied).

## Applying the Law to the Facts

The ALJ and the Board concluded that Dr. Elliott's false and deceptive answering of the application for reinstatement constituted an act that would qualify for disciplinary action under Health Occupation Article, § 14–404(a)(1). The ALJ first found:

[A] physician may not make a willful false representation when seeking or making application for licensure or any other application related to the practice of medicine. *The Respondent repeatedly and consistently failed to disclose information about complaints and investigations, conduct which I find was willful.* His failure to provide any information about investigations by four jurisdictions, about three lawsuits and about the limitation on his practice in one state raises an aura of suspicion that *leads me to believe his actions were willful.*

Pursuant to Md.Code Ann., Health Occ. § 14–205(a)(1)(iii), *the Board may* deny a license to an applicant or *refuse to renew* or reinstate *an applicant's license for any of the reasons that are grounds for action under § 14–404* of the Health Occupations article. *The Board has charged the Respondent with violating § 14–404(a)(1).*

(Emphasis supplied).

Turning to § 14–404(a)(1) specifically, the ALJ further found:

Pursuant to § 14–404(a)(1), *the Board may revoke a license if the licensee fraudulently or deceptively* obtains or *attempts to obtain a license. . . .*

*The Respondent clearly intended to present false information and knew that the answers on his application were false.* I conclude that *the evidence, taken as a whole,*

*provides compelling evidence of his intent to induce the Board, to its detriment, to reinstate the Respondent's license. His behavior was also deceptive.* Black's defines deceit as *"[t]he act of intentionally giving a false impression."* Black's Law Dictionary 413 (7th ed.1999). *That is certainly the case here. The Respondent intended to give the false impression that he had not been the subject of repeated complaints and investigations and malpractice claims.*

The Board has proven by more than a preponderance of the evidence that *the Respondent's conduct violated § 14–404(a)(1).*

(Emphasis supplied).

### Substantial Evidence Of the Intent to Deceive

■ Dr. Elliott has consistently maintained that the inaccuracy, or even falsity, of his answers on his application for reinstatement were not sufficient to sustain the Board's decision. He maintains that the evidence must have shown that his answers were deliberately deceptive. We fully agree.

The ALJ found that his answers were deliberately false and deceptive. More significantly, the Board found that his answers were deliberately false and deceptive. The only question for us is whether there was substantial evidence to support such a finding by the Board. All of the evidence that we have fully recounted demonstrates conclusively that it was abundantly substantial within the contemplation of the substantial evidence test.

### A Demeanor–Based Credibility Assessment

In addition to drawing the derivative inferences that the inherent improbability of Dr. Elliott's explanations for his silence gave rise to, the ALJ herself expressly made reference to her demeanor-based observations and conclusions.

I note that *the Respondent averted his eyes from my gaze as I administered the oath* against perjury to him and that *he avoided looking at me throughout much of his testimony*

despite the fact that I attempted to maintain eye contact with him. *He was simply not a credible witness.*

(Emphasis supplied).

Squeezing every drop of deference out of the *Anderson–Shrieves* Deference Rule that could ever be wished, the Board signed on to that demeanor-based credibility assessment with gusto.

The Board adopts the ALJ's characterizations of Dr. Elliott's testimony and arguments as *"disingenuous," "incredible," "preposterous," "especially lacking in credibility "* and *"entirely without merit."*

(Emphasis supplied). Who are we to say otherwise?

### Derivative Inferences of Deceit

There were many reasons for the ALJ to have concluded that Dr. Elliott was deliberately deceitful. In addition to her appraisal of his veracity based upon her observations of his demeanor, there were the derivative inferences that she could draw from the inherent implausibility of his explanations.

*Respondent's answers* to Question 8B, 8C and 8L *were not truthful. The Respondent's facile excuses* for failing to respond accurately to Question 8B, 8C and 8L *would perhaps have been more credible if he had reported several of the various licensing board inquiries and had merely overlooked one of them.* However, the record in this case is clear that *the Respondent failed to disclose four separate investigations, a limitation on his practice, required education, and three malpractice settlements.*

The record shows that the Respondent corresponded with the various regulatory and disciplinary boards of Illinois, Oregon, Maryland and Massachusetts. He had actual knowledge of the complaints, investigations and results in each case. As the Board correctly notes, *it is not for the Respondent to determine the relevance or importance of the information he was required to provide; it was simply his obligation to provide accurate and detailed information.*

The Board correctly observed that *a legal inference is permissible from the conduct of the parties. Fuller v. Horvath,* 42 Md.App. 671, 685, 402 A.2d 134 (1979). *There was so much information that the Respondent neglected to provide the Board that I must conclude that his failure to give honest, truthful, or accurate answers to the application questions was not innocent and was not due to mere oversight, forgetfulness or an inability to properly interpret the questions.* The Respondent simply had too many facile excuses for his various failures for me to give any credence to them. *The Respondent was willfully deceptive, fraudulent, and misleading* in his application answers and *I must conclude that he intended to hide the true nature of his professional medical history.* An application serves no purpose if a physician can be allowed to remain *as willfully ignorant as the Respondent professed to be* about his own personal history.

(Emphasis supplied).

The Board was fully in a proper position both to rely upon the inferences drawn by the ALJ and to draw its own derivative inferences in that regard. It did so.

*The Board agrees with the ALJ's factual findings* that Dr. Elliott knew he had been the subject of repeated complaints, investigations, board orders, and malpractice claims and *that he deliberately intended to deceive the Board by his answers to the application questions.* As the ALJ forcefully noted, *Dr. Elliott's answers were false, and they were intended to induce the Board to act to its detriment by reinstating his license* without further investigation of his background, an action which would have been to the detriment of the Board and to the patients in this State. *Dr. Elliott's testimony in which he gave various excuses for his actions was not credible;* his excuses are without merit.

(Emphasis supplied).

It would be easy in this case to say that the Board had massive and overwhelming evidence to support its ultimate

decision. All that is necessary for us to say, however, is that it had substantial evidence to do so. We so say.

## Redundant Adverbs

Section 10–404(a)(1) provides that the Board may "suspend or revoke a license if the licensee *fraudulently* or *deceptively* obtains or attempts to obtain a license." (Emphasis supplied). The pairing of adverbs strikes us as nothing more than redundant rhetoric. Assuming, *arguendo*, that there is some hypertechnical difference, the evidence overwhelmingly supported a finding of either or both.

After concluding that "an action for fraud or deceit ... is predicated upon a ... deliberate intent to deceive" and that "courts use the terms 'fraud' and 'deceit' interchangeably to describe intentional false conduct," the ALJ ruled that Dr. Elliott "clearly intended to present false information and knew that the answers on his application were false." As she went on in her ruling, the ALJ used the adjective "deceptive" but never expressly uttered the words "fraud," "fraudulent," or "fraudulently."

> *His behavior was also deceptive. Black's defines deceit as* "[t]he act of *intentionally giving a false impression.*" Black's Law Dictionary 413 (7th ed.1999). That is certainly the case here. *The Respondent intended to give the false impression that he had not been the subject of repeated complaints and investigations and malpractice claims.*

(Emphasis supplied).

By way perhaps of carrying coals to Newcastle, the Board did not hesitate to add the adverb "fraudulently." It hastened to point out, however, that it did not make a bit of difference whether its conclusion was embellished by the first adverb or by the second or by both.

> *The statute in question, HO § 14–404(a)(1), provides that the Board may sanction for either "fraudulently" or "deceptively" attempting to obtain a license. The ALJ* stated in no uncertain terms that Dr. Elliott's conduct met the necessary elements for being both fraudulent and deceptive, but

*did not use the word "fraudulently"* in the separate pro-
posed Conclusions of Law Section. *The Board adopts the
ALJ's conclusion that Dr. Elliott "deceptively" attempted to
obtain a medical license. This* aspect of Dr. Elliott's
offense *alone justifies denial of his application. The Board
has added the word "fraudulently" to its Conclusions* of
Law *because it is justified by the evidence* (and supported
by the discussion of the ALJ). To the extent that this word
was not used in the ALJ's specific proposed Conclusions of
Law, the Board modifies those proposed conclusions to
include that term. Again, however, *the Board emphasizes
that its conclusion that the application was also "fraudu-
lent" has had no effect on its denial of licensure* in this case;
in these particular circumstances, *the fact that Dr. Elliott
"deceptively" submitted his application would have itself
resulted in the denial of the application.*

(Emphasis supplied). We fully agree.

## The Burden of Ultimate Persuasion

On what basis, then, could Dr. Elliott have persuaded the
Circuit Court for Baltimore County to have reversed the
decision of the Board of Physicians? Dr. Elliott convinced the
court to reverse the Board because the ALJ had allegedly
used the wrong burden of persuasion. The circuit court ruled:

Although a review of the record indicates that the Board
produced a significant amount of evidence against Petition-
er, *the ALJ addressed her findings to the preponderance of
the evidence standard.* Without her express conclusion that
the evidence was sufficient to overcome the clear and con-
vincing evidence standard, neither the Board nor this Court
can assume that the State prosecutor met this burden. *The
ALJ erred in adopting the preponderance of the evidence
standard, and the Board erred in adopting this legal con-
clusion as well as determining that the evidence overcame
the clear and convincing evidentiary hurdle.*

Because this Court has determined that the higher clear
and convincing evidence standard should have been applied
at the merits hearing, it is unnecessary to address Petition-

*er's allegations of error regarding the Board's evaluation of the evidence* presented at said hearing.

(Emphasis supplied).

Dr. Elliott now has the burden of convincing us to reach that same conclusion. For a number of reasons, any one of which would be fatal to his argument, he fails to do so.

## The Burden of Persuasion Is a Question of Law

The issue of what burden of persuasion should have been employed by the Board is one of law. Accordingly, this Court owes no deference to the decision of the Board on this issue and will proceed to make its own *de novo* determination. *Coleman v. Anne Arundel County Police Department,* 369 Md. 108, 122, 797 A.2d 770 (2002), squarely addressed this issue.

Petitioner's sole issue before us, namely, *whether an incorrect standard of proof was applied* in the assessment of whether the Department proved the charges, *presents a purely legal question.* Accordingly, *this Court reviews the matter de novo.*

(Emphasis supplied).

## Random Thoughts on the Burden of Persuasion

Preliminarily, we need to place this contention in realistic perspective. Undoubtedly, identifying the applicable burden of persuasion and then providing some guidance as to what that burden entails is a salutary and necessary thing to do when it comes to instructing jurors at the end of a judicial trial. It is a device by which veteran and professional decision makers attempt to convey to lay jurors, many of whom are being faced with such a decision for the first time in their lives, some rough sense of that degree of certainty they should feel before rendering a particular verdict.[3] It has been said

---

**3.** In his concurring opinion in *In Re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), Justice Harlan explained:

The function of a standard of proof, as that concept is embodied in the Due Process Clause ... is to "instruct the factfinder concerning

that the three classical levels of persuasion—by a bare preponderance of the evidence, by clear and convincing evidence, and beyond a reasonable doubt—reflect, respectively, that the proposition before the jury is 1) probably true, 2) highly probably true, or 3) almost certainly true. Beyond that, there is really not much to be said.

When, by some dubious analogy, the law turned a lecture to the jurors on decision-making into a procedural requirement for all fact-finding and began applying it not only to laymen but to professional decision makers as well—be they judges sitting as a jury, administrative board members, or ALJ's—the utility of the enterprise became a lot less certain. Veteran judges, sitting as a jury, will frequently deem it discreet, even if not necessarily commendable, to say nothing about the burden of persuasion, so as to enjoy the presumption of having done the right thing. When the burden is mentioned, it is sometimes simply by way of rationalizing a seemingly improbable result that could disappoint the expectations of the audience. Candor requires us to acknowledge that, when applied other than in the context of jury instructions, this body of law can be more of a procedural obstacle course than a genuine contribution to the judicial process.[4]

---

the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."

4. As Judge Harrell very insightfully noted in *Coleman v. Anne Arundel County Police Department*, 369 Md. 108, 147–48, 797 A.2d 770 (2002):

*Nor do we find that implementation of the heightened standard of proof sought by Petitioner would so significantly reduce the risk of error that it should be implemented regardless of any additional administrative or financial burdens it would entail.* Candor requires that we acknowledge the difficulty a lay panel may encounter in perceiving the subtle distinctions and nuances between these two abstract standards when called upon to apply it. *See also Wills v. State,* 329 Md. 370, 374, 620 A.2d 295, 297 (1993) (noting that *the terms* "preponderance," "clear and convincing," and "reasonable doubt" *are not* "at least in their legal sense, *street familiar*"); *Weisman v. Connors,* 76 Md.App. 488, 503, 547 A.2d 636, 643 (1988) (noting the "amorphous" nature of the clear and convincing standard); *Tippett v. Maryland,* 436 F.2d 1153, 1158–59 (4th Cir.1971), cert. dismissed, *sub nom. Murel v. Balt. City Criminal Court,* 407 U.S. 355, 360, 92 S.Ct. 2091,

Two characteristics about the burden of persuasion need to be kept in mind. When applied to decision makers other than lay jurors, what matters is what they say about the burden at the end of the adjudicatory process, not what may have been said at the beginning of the hearing. At the end of the adjudication, we are concerned with the degree of certitude with which the ultimate decision was actually reached. At the beginning of the process, by contrast, we should not imagine that the decision maker is going to go into a different mind set as he receives the evidence or pull down from the shelf a different microscope in anticipation of thinking about the ultimate verdict. No decision maker is that constantly introspective as the trial unfolds. Even a jury is only instructed about the burden of persuasion at the end of the trial.

A second characteristic to be kept in the front of the mind is that the burden of persuasion, whatever it may be, does not apply to every constituent element that enters into the totality or to every evidentiary fragment that comes into a hearing. It only applies to the ultimate verdict based on the decision maker's evaluation of the entire hearing and the totality of the evidence. The burden of persuasion is not a tollgate for admissibility. It deals only with the degree of mental certainty undergirding the final decision.

### Our Concern is With the Board's Persuasion, Not the ALJ's

At the outset of her Proposed Decision, the ALJ reconfirmed that at an earlier stage of the case she had ruled that the pertinent burden of persuasion was that of a bare preponderance of the evidence.

At the hearing on the Board's Motion for Summary Decision, the Respondent argued that the clear and convincing evidence standard applies in this matter. The Board

---

2094, 32 L.Ed.2d 791 (1972) ("However meaningful the distinction [between the two standards] may be to ... judges, ... *it is greatly to be doubted that a jury's verdict would ever be influenced by the choice of one standard or the other.*").
(Emphasis supplied).

raised the issue again after the hearing in its Post–Hearing Memorandum.[6] The issue of the standard of proof was previously addressed by me in my Proposed Decision and Ruling on Motion for Summary Decision. *As this matter does not pertain to a standard of care issue, the preponderance of the evidence standard is the appropriate standard.*[7]

6. The Board also cited *Coleman v. Anne Arundel County Police Dept.,* 369 Md. 108, 797 A.2d 770 (2002) and noted that *the burden of proof is not elevated to the clear and convincing evidentiary standard because the Respondent is alleged to have engaged in fraudulent or deceitful conduct.*

7. Although the clear and convincing evidence standard applies to standard of care issues, it is the lesser preponderance of the evidence standard that applies in an action arising under § 14–205(a). *There is no statutory provision that imposes the clear and convincing evidentiary standard upon actions that arise from Health Occ. § 14–205(a)(1)(iii).* In the absence of a statute specifying a particular standard of proof, *the standard in an administrative proceeding shall be the preponderance of the evidence.* Md.Code Ann. State Gov't § 10–217 (1999 & Supp.2002).

(Emphasis supplied).

Before even turning to what the appropriate burden of persuasion in this case actually is, we point out that the first fatal flaw in Dr. Elliott's contention is that it is aimed at the wrong decision by the wrong decision maker. As the caselaw has regularly repeated (and as we in this opinion have regularly repeated), our review is of the Board's decision, not the ALJ's decision. Unless something the ALJ did irredeemably contaminated what the Board later did, we are blithely indifferent to any alleged procedural irregularity in the hearing before the ALJ. This is what we mean when we say we are reviewing only the decision of the Board.

There is no necessary correlation between the degree of persuasion reached by the ALJ and that reached by the Board, even when they agree. On the same record, the levels of persuasion of independent fact finders can float upward or downward independently of each other. The record that persuades one fact finder by a bare preponderance of the evidence may persuade another fact finder clearly and convincingly or yet another fact finder beyond a reasonable doubt. It might leave a fourth fact finder utterly unpersuaded. The ALJ's burden of persuasion, moreover, applies to the

ALJ's ultimate proposed disposition of the entire case and not to each and every one of 31 findings of fact that may have entered into that proposed disposition. The Board is fully entitled to look at the record developed before the ALJ regardless of what burden of persuasion the ALJ may have been using.

We shall look at the Board's level of persuasion in a moment, although Dr. Elliott does not directly challenge it. Unless what the ALJ did caused the decision of the Board to be fatally flawed, we really do not care what burden of persuasion the ALJ may have employed. If it really mattered, however, we would be hard put not to agree with the Board as it concluded, in its Final Order, with respect to the ALJ's actual degree of certitude at the conclusion of the hearing before the ALJ.

> Although the ALJ correctly ruled that the findings need only be made by a preponderance of the evidence, *the ALJ opined that the case was "compelling" and that the case was proven by "more than a preponderance."*

(Emphasis supplied). But see *Coleman v. Anne Arundel County Police Department,* 136 Md.App. 419, 445–46, 766 A.2d 169 (2001).

The only issue in genuine dispute before the ALJ was whether Dr. Elliott had been intentionally false and deceptive in providing the answers he did on his license reinstatement application. On top of page after page of findings as to his having been deliberately false and deceptive, the tip of the iceberg was the ALJ's characterizations of his testimony as "disingenuous," "incredible," "preposterous," "especially lacking in credibility" and "entirely without merit." That would seem to communicate the unequivocal message not that she was merely a little bit convinced of his intentional deceit but that she was a whole lot convinced. Is not that the very degree of certainty that the higher burden of persuasion is designed to guarantee? Even if the ALJ never said the magic

words, do we honestly have any doubt? [5]

## While Agreeing That It Was Not Required, The Board Gratuitously Used the "Clear and Convincing" Standard

As far as the critical decision of the Board itself was concerned, Dr. Elliott got more than he was entitled to with respect to the burden of persuasion. The Board had before it, of course, the proposed fact-findings and the proposed disposition of the ALJ. The Board made, however, its own independent evaluation of the entire record. It had a transcript of the testimony before the ALJ. It had critical documentation to review for itself—the reinstatement application form, Dr. Elliott's answers on that form, and the records from the medical licensing authorities in Illinois, Oregon, Massachusetts, and Maryland. It had the court records detailing the three malpractice suits and their settlements.

■ The lion's share of the ALJ's fact-finding, moreover, consisted of derivative inferences which the Board was fully competent to draw for itself and did draw for itself. Even the credibility findings as to Dr. Elliott's deceitfulness were not so much demeanor-based as they were based upon the inherent improbability of the excuses in face of the undeniable documentary reality. When the Board "adopts" the findings of fact of the ALJ, moreover, none of those individual findings of fact needs to have been found, by either the ALJ or the Board, according to any particular standard of persuasion. The

---

5. There is an unreal quality to this entire inquiry. It is as if someone were to read Winston Churchill's "We shall fight them on the beaches" speech of June 1940 and still, because he never expressly stated his standard of persuasion, be in doubt whether Churchill was only a little bit resolved to resist the Germans or was a whole lot resolved to do so. The difference between the first two standards of persuasion is only the difference between being persuaded a little bit and being persuaded a whole lot.

Are we so obsessed with getting the abracadabra down pat that we lose sight of the unmistakable reality of what really happened? Certainty sometimes proclaims itself. How do we know when that occurs? Because that's the appellate art. In this case, however, it is not necessary to decide that.

burden of persuasion, whatever it may be, applies only to the degree of certitude felt about the final decision based on the totality of the facts, not to the finding of each constituent fact that enters into the totality. Circumstantial evidence is a classic example of this principle. Individual circumstances are frequently very tenuous or marginal in their persuasiveness, but the combination of many circumstances nonetheless yields a very convincing case.

Even while agreeing with the ALJ that the "clear and convincing" standard of persuasion did not apply, the Board observed that that higher standard had nonetheless gratuitously been satisfied:

> Although not required to do so, *the Administrative Prosecutor has proven the facts by clear and convincing evidence.*

(Emphasis supplied). Dr. Elliott could have wished for nothing more.

### Even Health Occupations, § 14–404 Did Not Call For The "Clear and Convincing" Burden of Persuasion

Even if the Board had not been persuaded by the "clear and convincing" standard it would make no difference, however, because the "clear and convincing" standard was not required. Dr. Elliott argues to us, as he did successfully to the circuit court, that the "clear and convincing" burden of persuasion was mandated by Health Occupations Article, §§ 14–404 and 14–405. The Board's denial of Dr. Elliott's application for the renewal of his license was grounded in § 14–205(a)(1)(iii), which in pertinent part provides:

> (a) *Powers.*—(1) In addition to the powers set forth elsewhere in this title, the Board may:
>
> . . . .
>
> (iii) Subject to the Administrative Procedure Act, ... refuse to renew or reinstate an applicant's license for any of the reasons that are grounds for action under § 14–404 of this title.

An action pursuant to § 14–205(a)(1)(iii) is, by its express terms, subject to the Administrative Procedure Act, State

Government Article, Title 10. For the adjudication of a contested case under the APA, § 10–217 provides:

> The standard of proof in a contested case shall be the preponderance of the evidence unless the standard of clear and convincing evidence is imposed on the agency by regulation, statute, or constitution.

(Emphasis supplied). See *Lussier v. Maryland Racing Commission*, 100 Md.App. 190, 215–16, 640 A.2d 259 (1994).

Although all parties agree that a proceeding under Health Occupations Article, § 14–205 would ordinarily be controlled by the APA and would involve the "bare preponderance of the evidence" burden of persuasion, Dr. Elliott argues that because § 14–205 makes reference to § 14–404, § 14–404 "trumps" § 14–205 when it comes to determining the procedural requirements for litigating a contested case. The circuit court bought Dr. Elliott's argument and ruled as follows:

> In the instant matter, *the Board invoked Health Occupations § 14–205 and § 14–404* in its Notice of Initial Denial for Reinstatement of Application. Health Occupations § 14–205(a)(1)(iii) entitles the Board to deny a license to an applicant or refuse to renew or reinstate an applicant's license for any of the reasons that are grounds for action under HO § 14–404. *§ 14–405 provides that before the Board takes any action under § 14–404(a),* it shall give the individual against whom the action is contemplated an opportunity for a hearing (HO § 14–405(a)), and *any "factual findings shall be supported by clear and convincing evidence." In order for the Board to proceed under § 14–205, it must make factual findings pursuant to § 14–404, and any findings*—according to § 14–405(b)—*must be supported by clear and convincing evidence.*

(Emphasis supplied).

In a moment we shall examine the validity of Dr. Elliott's claim that a reference by some other section to § 14–404 necessarily engages, even on a hearing with respect to that other section, the procedures that would attend a hearing on a complaint brought pursuant to § 14–404 directly. For the

nonce, as we catalogue the flaws in Dr. Elliott's argument, it is enough to note that, even if we were to assume, purely *arguendo*, that § 14–404 governed the procedural requirements in this case, the "clear and convincing" standard still would not have been mandated.

Title 14 of the Health Occupations Article deals with "Physicians" and Subtitle 4 thereof deals with "Disciplinary Actions." Section 14–404 applies directly to actual present medical licensees and lists 41 separate actions that could subject a licensee to discipline at the hands of the Board. The procedures for conducting a hearing on a § 14–404 violation are, in turn, spelled out by § 14–405.

Section 14–405(b)(1) and (2) now provide:

(b) *Application of Administrative Procedure Act.*—(1) The hearing officer shall give notice and hold the hearing in accordance with the Administrative Procedure Act.

(2) *Factual findings shall be supported by a preponderance of the evidence.*

(Emphasis supplied).

That provision, however, is not dispositive of the issue before us because that subsection, enacted by Acts of 2004, Special Session, ch. 5, § 4, only became effective on January 11, 2005, at a time too late to have controlled the pertinent hearings in this case. Section 14–405's burden of persuasion for a contested APA hearing for a violation of § 14–404 has been in active ferment in recent years. Whereas hearings on all possible violations of § 14–404 will now be held using the "bare preponderance" standard, prior to July 1, 2003, hearings on all possible violations used the "clear and convincing" standard. Prior to July 1, 2003, § 14–405(b) provided:

The hearing officer shall give notice and hold the hearing in accordance with the Administrative Procedure Act except that *factual findings shall be supported by clear and convincing evidence.*

(Emphasis supplied).

Between those two general provisions, covering all § 14–404 violations alike, there was an intermediate stage that engaged

in fine tuning with respect to particular violations. Ch. 252 of the Acts of 2003 reduced the burden of persuasion for all but one of § 14–404's violations, but left the burden at the higher level for a violation of § 14–404(22), dealing with breaches of the standard of care. Section 14–404(b)(2) and (3) then provided:

(2) *Except as provided* in paragraph (3) of this subsection, *factual findings shall be supported by a preponderance of the evidence.*

(3) *Factual findings shall be supported by clear and convincing evidence if the charge of the Board is based on § 14–404(a)(22).*

(Emphasis supplied).

The Board's charges against Dr. Elliott had nothing to do with § 14–404(a)(22), so that exception to the downgrading of the burden of persuasion has no bearing on this case. What is pertinent to this phase of our analysis is the effective date of the downgrading of July 1, 2003.

The two decisions that we will consider straddle that date. The ALJ rendered her decision on March 17,2003, three and one-half months before the burden of persuasion was downgraded. On the other hand, the Board rendered its decision on September 30, 2003, three months after the downgrading had become effective.

As we have been stating consistently and repeatedly, the only action that we are reviewing is the decision of the Board on September 30, 2003. Even under § 14–405, assuming for the moment that it applied, the burden of persuasion applicable to the Board's decision of September 30, 2003 had become, as of that date, that of a "bare preponderance of the evidence."

As we have already discussed at length, the Board—through a review of the documents and a review of the record from which it could draw its own derivative inferences—had substantial evidence for its final decision even without adopting any findings by the ALJ. Even with respect to the adoption of

the ALJ's findings, however, nothing was remotely improper or irregular.

Even assuming, *arguendo,* that the ALJ's findings of March 17, 2003, were inadequate when made, because they were made on a lower than required burden of persuasion, they had ripened into adequate findings by the time the Board relied on them on September 30, 2003. The critical date was when the Board relied on the ALJ's findings and not when the ALJ's findings were initially made.

If the ALJ had made the same findings relying on the "bare preponderance" standard on July 2, 2003, the day after the downgrading became effective, there clearly would have been no impediment to their having been relied on by the Board on September 30, 2003. Precisely the same findings by precisely the same ALJ by precisely the same burden of persuasion would have been just as qualitatively reliable on September 30, 2003, even if they had been made prior to July 1, 2003, under what might arguably have been, at that time, an inadequate burden of persuasion. Even if questionable when made, the quality of the findings had been upgraded on July 1, 2003, and had become worthy of reliance. Even if a bit unripe when bottled, the wine had properly aged before it was served.

### Sections 14–404 and § 14–405 Do Not Control the Burden of Persuasion

The final flaw in Dr. Elliott's argument is its failure to recognize that the Board's proceeding against him was not pursuant to § 14–404. It was pursuant to § 14–205, which calls for a standard APA contested case hearing using the standard "bare preponderance" burden of persuasion. Section 14–205 may refer to § 14–404, but it does not become § 14–404.

Judge Hollander's opinion in *Oltman v. Maryland State Board of Physicians,* 162 Md.App. 457, 875 A.2d 200, *cert. denied,* 389 Md. 125, 883 A.2d 915 (2005), is absolutely dispositive on this point. Whereas in this case the Board of Physicians denied the reinstatement of a license, in *Oltman* the

Board of Physicians revoked a certificate. This case does not involve § 14–404 directly because Dr. Elliott is not currently a licensed physician in Maryland. *Oltman* did not involve § 14–404 directly because Oltman was not a licensed physician but a certified physician assistant. Both Dr. Elliott and Oltman were charged with conduct that, if done by a licensee, would have been a violation of § 14–404.

Whereas Dr. Elliott was directly charged pursuant to § 14–205, which made reference to § 14–404, Oltman was directly charged pursuant to § 15–314(3), which also made reference to § 14–404. Whereas in this case, Dr. Elliott is invoking a particular burden of persuasion as a procedural incident of §§ 14–404 and 14–405, *Oltman* invoked the entitlement to a Case Resolution Conference ("CRC") as a procedural incident of § 14–404.

Judge Hollander's opinion made it clear that the complaint against Oltman was being pursued under § 15–314 and that the controlling procedures were, therefore, those provided by § 15–314. The fact that there was a reference to § 14–404 in no way implicated the procedures normally attendant on § 14–404.

> Here, the proceedings were initiated under H.O. Title 15, not H.O. Title 14. *The Board determined that, because appellant was charged under H.O. § 15–314(3), appellant was subject to the procedural mechanisms of H.O. Title 15, even though the provisions of H.O. § 14–404(b) were cross-referenced.* In its "Reversal of Dismissal and Interim Order of Remand," the Board stated: "Section 15–314 speaks of a 'basis for disciplinary action' set out in 14–404, but *there is no indication that the procedures of 14–404 are meant to be applied to physician assistant discipline under 15–314.*"

162 Md.App. at 493–94, 875 A.2d 200 (emphasis supplied).

In that case, as in this, the Board of Physicians was dealing with a statute that it regularly interpreted and administered. What the *Oltman* opinion admonished about the deference that is due the Board in making such calls within its area of

competence is equally apt as we look at similar calls by the Board in this case.

It is well settled that *"an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." [S]ee Solomon v. Bd. of Physician Quality Assurance,* 132 Md.App. 447, 455, 752 A.2d 1217 (2000) (deciding to "accord the Board's interpretation of the Maryland Medical Practice Act considerable weight and deference"). "The same principles apply to an agency's interpretation of its own regulation."

In light of these principles, we hold that the Board did not err in concluding that appellant was not entitled to a CRC; there is no statutory or regulatory provision requiring the Board to grant a CRC in a case arising under H.O. § 15–314(3).

162 Md.App. at 494–95, 875 A.2d 200 (emphasis supplied).

## The Civil Tort of Fraud Is One Thing; Administrative Allegations of Fraudulent Conduct Are Something Less

In a final effort to raise the bar of persuasion, Dr. Elliott waves the bloody shirt of "fraud." His argument is that whenever allegations, even in the context of an administrative hearing, charge or even intimate that the conduct of the offender was fraudulent, the very nature of such a charge *ipso facto* raises the required level of persuasion. When extended to administrative proceedings, it is an argument grounded in the reasoning of *Everett v. Baltimore Gas and Electric Co.,* 307 Md. 286, 513 A.2d 882 (1986). When in that case the Maryland Public Service Commission charged a customer with dishonest conduct that amounted to fraud, the Court of Appeals held that "because of the seriousness of the allegations," the "more exacting" standard of persuasion was required. The holding of *Everett* was:

*[W]here a utility alleges that a customer engaged in conduct amounting to fraud* or to a crime and such conduct constitutes the sole basis of the customer's alleged responsibility for prior unpaid bills, *the utility must prove its*

*allegation by clear and convincing evidence* to justify termination of service for non-payment.

307 Md. at 304, 513 A.2d 882 (emphasis supplied).

Such an argument, albeit potent under *Everett,* cannot survive *Coleman v. Anne Arundel County Police Department,* 369 Md. 108, 797 A.2d 770 (2002). Coleman was a 19-year veteran of the Anne Arundel County Police Department who was found by the departmental Administrative Hearing Board to have committed theft. The Board ruled that Coleman's employment should be terminated. The Hearing Board had used the "preponderance of the evidence" burden of persuasion. On appeal, first to the circuit court, then to the Court of Special Appeals, and finally to the Court of Appeals, Coleman protested the use of the lesser standard of persuasion, as he alleged

> various errors of law, including *an alleged error that the Board had applied the preponderance of the evidence standard of proof, rather than the clear and convincing evidence standard* required by the circumstances, in its assessment of whether the Department had proven the charges.

369 Md. at 115, 797 A.2d 770 (emphasis supplied). His argument at all three levels of review was based squarely on *Everett.*

> Petitioner's first contention essentially is that *Everett* mandates otherwise, *arguing that the burden of clear and convincing evidence, as opposed to the less rigorous standard of preponderance of the evidence, is required by the nature of the charges* in the present case. *Petitioner's assertion primarily relies upon this Court's holding in Everett,* which Petitioner contends stands for the proposition that *proof by clear and convincing evidence is required in an administrative adjudicatory hearing whenever the charging allegation involves "fraud, dishonesty,* or a serious criminal offense." Petitioner argues that the *allegations of his theft-related misconduct include all of these elements, which, in a civil judicial forum, requires proof by the clear and convincing standard.* Noting that *the fixed burden of persuasion ought to be the same in an administrative*

*proceeding as it is in a civil judicial proceeding* involving allegations of like nature, Petitioner argues that the allegations of his theft-related misconduct must be supported by the higher evidentiary standard of clear and convincing evidence.

369 Md. at 124–26, 797 A.2d 770 (emphasis supplied).

After the Circuit Court for Anne Arundel County affirmed the decision of the Administrative Hearing Board, Coleman brought the issue to this Court. Judge Kenney undertook the Herculean labor of wrestling with the wide-ranging tentacles of *Everett.* Grasping tightly onto *Meyers v. Montgomery County Police Department,* 96 Md.App. 668, 626 A.2d 1010 (1993), we wriggled out from under the jackboot of *Everett* and also affirmed. When the review reached the Court of Appeals, Judge Harrell (who had authored the *Meyers* opinion for this Court) first noted that there was "a need to re-visit this Court's decision in *Everett,*" 369 Md. at 123, 797 A.2d 770, and then wielded the sword empowered to cut the Gordian Knot.

*We need not engage,* as the Court of Special Appeals did in *Meyers, in an elaborate effort to distinguish Everett* from the facts of the case at hand. This is so because, *unlike the intermediate appellate court, we have the authority, and shall exercise it in this instance, to overrule Everett.*

369 Md. at 135, 797 A.2d 770 (emphasis supplied).

Judge Harrell explained how the lay of the land in administrative law had changed dramatically since the time that *Everett* had been decided.

At the time *Everett* was decided, the contours of general state administrative law principles in Maryland were materially different than now. *The Court then did not have the benefit of a broad public policy pronouncement by the State legislature that expressed a particular standard of proof requirement relative to contested administrative cases.* Seeking a principled basis for its decision in the absence of such a policy, the *Everett* Court sought guidance, by analogy, from the common law, which traditionally required the intermediate standard of clear and convincing evidence to

prove allegations of fraud in civil judicial proceedings. The Court drew on that analogy to decide *Everett. The relevant legal terrain, however, has changed since Everett was decided.*

369 Md. at 135–36, 797 A.2d 770 (emphasis supplied).

The most prominent change, for purposes of the *Coleman* decision and for our purposes, was that by ch. 59, § 1, of the Acts of 1993, the General Assembly had promulgated what is now State Government Article, § 10–217, "establish[ing], for the first time, preponderance of the evidence as the generally applicable standard of proof to be used by covered state administrative agencies in contested case hearings." 369 Md. at 136, 797 A.2d 770.

The Court of Appeals then surveyed the caselaw nationally and concluded that *Everett* was ripe for overruling.

*Our conclusion is reinforced by comparison of the decisions of other states addressing similar questions. See, e.g., Romulus v. Anchorage Sch. Dist.,* 910 P.2d 610, 618–19 (Alaska 1996) (upholding termination of teacher for sexually abusing students based on preponderance of the evidence standard which applies to disciplinary proceedings involving a government employee); *Clark v. Bd. of Fire and Police Comm'rs,* 245 Ill.App.3d 385, 184 Ill.Dec. 509, 613 N.E.2d 826, 829–30 (1993) (applying preponderance of the evidence standard in police officer's termination proceedings for obstruction of justice, bribery, conspiracy and official misconduct); *Romeo v. Dep't of Employment and Training,* 150 Vt. 591, 556 A.2d 93, 94 (1988) (stating that misconduct allegations of theft need only be proven by the civil standard of a preponderance of the evidence).

*Everett v. Balt. Gas & Elec. Co.,* 307 Md. 286, 513 A.2d 882 (1986), *is inconsistent with the holding in the present case and is overruled.*

369 Md. at 141, 797 A.2d 770 (emphasis supplied).

## Conclusion

In this case, 1) there was substantial evidence to support the decision of the Board of Physicians and 2) the Board of

Physicians applied the right "preponderance of the evidence" burden of persuasion in reaching its decision. The decision of the Board should be affirmed. Accordingly, the judgment of the Circuit Court for Baltimore County must be reversed.

**JUDGMENT OF THE CIRCUIT COURT OF BALTIMORE COUNTY REVERSED AND CASE REMANDED FOR THE AFFIRMING OF THE DECISION OF THE BOARD OF PHYSICIANS; COSTS TO BE PAID BY APPELLEE.**